Ralph NADER, Plaintiff,

v.

William J. BAROODY, Jr., Assistant to
the President for Public Liaison,
Defendant.

Civ. A. No. 74-1675.

United States District Court,
District of Columbia.

June 23, 1975.

Larry P. Ellsworth, Washington, D. C., for plaintiff.

Paul M. Tschirhart, Asst. U. S. Atty., Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

GESELL, District Judge.

In this action plaintiff seeks a declaratory judgment to the effect that certain bi-weekly meetings with selected groups held at the White House create "advisory committees" within the meaning of section 3(2) of the Federal Advisory Committee Act, 5 U.S.C. App. I, Pub.L. 92-463, 86 Stat. 770, approved October 6, 1972, and an injunction directing defendant to comply with the open meeting and other requirements of that Act. On the basis of information gathered under the Freedom of Information Act and by interrogatories, the White House has made full disclosure and the parties are in agreement as to

the underlying facts. The matter comes before the Court on cross-motions for summary judgment which have been fully briefed and well argued.

Beginning in June, 1974, the Assistant to the President of the United States for Public Liaison has regularly convened meetings every two weeks between different high officials of the executive branch and major business organizations or private sector groups to encourage an exchange of views. This program is designed to open the White House to groups in the private sector and increase the flow of information between these groups and top Executive officials, including the President. A different group meets every two weeks. In some fifteen separate meetings at the White House, representatives of the housing construction and residential financing industries, senior citizens, life insurance industry, agriculture and livestock industries, electric utilities, printing industry, professional service firms, food processing firms, women business leaders, National Council of Churches, home economists in business, grocery manufacturers, youth and technology, and insurance have met. The attendance is by specific invitation to named individuals. A meeting runs an average of three and one-half hours. The private participants have sometimes on their own initiative provided views and recommendations on a variety of subjects in advance of or subsequent to the meetings. The President has attended a portion of four of these meetings. After each meeting a memorandum is prepared of what transpired, summarizing the varying views or varying recommendations received. Further White House meetings of this kind are regularly being scheduled.

█ The specific and only issue presented is one of statutory interpreta-tion, namely, whether the series of meetings or the individual meetings viewed separately have created one or more advisory committees within the meaning of the Act. If, in legal contemplation, these are meetings of one or more advisory committees, a series of consequences flow which, as a practical matter, would make the program impractical because of the limited facilities at the White House, loss of scheduling flexibility, security, etc. Members of the press and public would be authorized to attend,[1] after advance notice in the *Federal Register*,[2] and a number of other procedural and substantive changes would be required by the Act. Plaintiff is a consumer representative who asked to attend and was denied admission and thus he has standing to sue.

Subject to certain exceptions not here relevant, an advisory committee includes "any committee, board, commission, council, conference, panel, task force, or other similar group . . . established or utilized by the President . . . in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government . . . ." 5 U.S.C. App. I § 3(2). Thus, it is apparent that the Act contains a very broad, imprecise definition, and in this respect is not a model of draftsmanship. The very vagueness and sweeping character of the definition permits a reading which could include the ad hoc groups here involved as well as any other less formal conference of two or more non-government persons who advise the President.

A careful review of the legislative history throws some light on the problem. Congress was aware that advisory committees had proliferated in the federal bureaucracy to such numbers and at such expense that there was need for

---

1. "Each advisory committee meeting shall be open to the public." 5 U.S.C. App. I § 10(a)(1).

2. "Except when the President determines otherwise for reasons of national security, timely notice of each such meeting shall be published in the Federal Register . . . ." *Id.* (a)(2).

some regulation and greater disclosure. In enacting Pub.L. 92–463, Congress had clearly in mind prior efforts by the executive branch to control the proliferation of these groups, *see, e. g.*, Executive Order 11007, 27 Fed.Reg. 1875 (Feb. 26, 1962); OMB Circular A–63 (Mar. 22, 1964). Congress accepted the broad outlines developed by prior administrative practice as the point of departure for its own definition of "advisory committees," making explicit those points at which its definition differed from prior usage. H.R.Rep.No.1017, 92d Cong., 2d Sess. 3–4 (1972), U.S.Code Cong. & Admin.News, 1972, p. 3491. While Congress did not adopt the precise wording of the OMB Circular, *supra*, to the effect that only "formally constituted" groups were to be covered, *see also* § 1(4) Executive Order 11671, 37 Fed. Reg. 11307 (June 5, 1972), it clearly had in mind established entities subject to *enumeration*. *See* H.R.Rep.No.1017, *supra* at 7.

██ That the Act was not intended to apply to all amorphous, ad hoc group meetings is also made clear by judicial constructions given the statute since enactment.[3] The administration of the Act is to the same effect. Section 7 of the statute creates within OMB a special secretariat charged with overseeing the operations of all advisory committees and prescribing "administrative guidelines and management controls" applicable to them. *See also* Executive Order 11686, 37 Fed.Reg. 21421 (Oct. 7, 1972). In accordance with these responsibilities, OMB promulgated a joint memorandum with the Department of Justice directed to all agency and department heads setting forth detailed standards as to how the Act was to be implemented. 38 Fed.Reg. 2306 (Jan. 23, 1973). Paragraph 4(a)(1) of this implementing memorandum contains administrative guidelines defining "advisory committees" in a way flatly inconsistent with the extension of the Act's requirements to informal group meetings with citizens such as those at issue here.[4] The administrative practice, both before and after the Act, has been to consider only groups having some sort of established structure and defined purpose as "advisory committees," and Congress has not voiced objection to this construction. Congress clearly intended that formally organized advisory committees should come under the Act even at the presidential level and the White House has responded in this regard, but since the passage of the Act there has been no attempt by either President Nixon or President Ford to go beyond this requirement and open up for public participation and scrutiny all meetings at the

---

3. Center for Auto Safety v. Morton, Civil Action No. 74–1566 (D.D.C., Oct. 28, 1974) (Pratt, J.); *id.*, (June 6, 1975) (Robinson, J.); *compare* Aviation Consumer Action Project v. Yohe, Civil Action No. 707–73 (D.D.C., June 24, 1974); Food Chemical News, Inc. v. Davis, 378 F.Supp. 1048 (D. D.C., 1974).

4. "4. Committees covered by the Act. a. . . .

"The terms of the Act and its legislative history, including numerous indications of reliance upon concepts used in Executive Order No. 11007 (1962) and No. 11671 (1972), show that while broad coverage was intended, the statute is aimed at "advisory committees or similar groups" in the ordinary sense. In general, such bodies would have all or most of the following characteristics:

(a) Fixed membership, usually selected by a Federal official or determined on the basis of Federal law;

(b) Established by a Federal official or on the basis of Federal law; or, if not federally established, the initiative for its use as an advisory body for the Federal Government came from a Federal official rather than from a private group;

(c) A defined purpose of providing advice regarding a particular subject or particular subjects;

(d) An organizational structure (*e. g.*, officers) and a staff;

(e) Regular or periodic meetings.

"Thus, for example, the Act would not apply where a group of persons seeks and obtains a meeting (or even a series of meetings) with a Federal official in order to present him with their views on certain subjects." 38 Fed.Reg. 2307.

White House with non-public officials on matters of general concern where unsolicited advice has been offered.

█ Examination of the Act as a whole, and the indications found there, confirms the legislative history, and points to the conclusion that Congress was concerned with advisory committees formally organized which the President or an executive department or official directed to make recommendations on an identified governmental policy for which specified advice was being sought. Various provisions of the Act are designed to encourage the termination of many such committees and a reporting procedure was effectuated to bring the complexity of the problem into sharper focus. Nowhere is there an indication that Congress intended to intrude upon the day-to-day functioning of the presidency or in any way to impede casual, informal contacts by the President or his immediate staff with interested segments of the population or restrict his ability to receive unsolicited views on topics useful to him in carrying out his overall executive and political responsibilities.

There is no indication that the meetings here under scrutiny involved a presidential request for specific recommendations on a particular matter of governmental policy. *Compare Food Chemical News, Inc.* v. *Davis, supra,* 378 F.Supp. at 1050 (proposed amendments to regulations). The committees were not formally organized and there is little or no continuity. Nor is there any suggestion that the lack of formal organization arises out of a purpose to evade the

statute. If the President desired recommendations on an identifiable national policy in which he is interested, in all likelihood he would not rely on a group with apparently narrow focus but would formulate policy, as has been done with past advisory committees, by soliciting the mixed views of labor, consumers, public interest groups, and other segments affected. The President has merely wisely provided a mechanism and sounding board to test the pulse of the country by conferring directly or indirectly with widely disparate special interest groups.

To hold that Congress intended to subject meetings of this kind to press scrutiny and public participation with advance notice on formulated agendas, etc., as required by the Act, would raise the most serious questions under our tripartite form of government as to the congressional power to restrict the effective discharge of the President's business.[5] *Cf. United States* v. *Nixon,* 418 U.S. 683, 711, 94 S.Ct. 3090, 41 L. Ed.2d 1039 (1974); *Myers* v. *United States,* 272 U.S. 52, 131, 164, 47 S.Ct. 21, 71 L.Ed. 160 (1926): *Soucie* v. *David,* 145 U.S.App.D.C. 144, 448 F.2d 1067, 1080–84 (1971) (Wilkey, J., concurring).

█ To avoid serious constitutional questions implicit in plaintiff's position and to reach an interpretation of the statute consistent with its overall provisions and legislative history, the Court declares that the White House meetings here under review do not involve "advisory committees," since the group meetings are unstructured, informal and not

---

5. Plaintiff argues, citing *Soucie* v. *David,* 145 U.S.App.D.C. 144, 448 F.2d 1067, 1071 n. 8 (1971), that there has been no claim by the President of the privilege of confidentiality recognized in *United States* v. *Nixon, supra.* That misses the point.

The Supreme Court in *United States* v. *Nixon,* while agreeing that no privilege against disclosure of executive branch conversations was to be found on the face of the Constitution, held one was implied as "neces-

sary and proper," *see* 418 U.S. at 705–06 n. 16, 94 S.Ct. 3090, to "the effective discharge of a President's powers," 418 U.S. at 711, 94 S.Ct. at 3109.

It is not that the construction of the Act plaintiff urges would impinge on the privilege of confidentiality for executive communications itself, but that it might impinge on the effective discharge of the President's powers, the interest necessitating the privilege, which raises constitutional questions.

conducted for the purpose of obtaining advice on specific subjects indicated in advance. Accordingly, summary judgment will be granted for the defendant, denied for the plaintiff, and the complaint is dismissed.

So ordered.