**The NATIONAL NUTRITIONAL FOODS ASSOCIATION and Protein Products Association, Plaintiffs,**

v.

**Joseph A. CALIFANO, Jr., Secretary of Health, Education and Welfare, Donald M. Kennedy, Commissioner of Food and Drugs, and Allan L. Forbes, M.D., Acting Associate Director for Nutrition and Consumer Sciences, Bureau of Foods, Defendants.**

**No. 77 CIV 6083 (LBS).**

United States District Court, S. D. New York.

Aug. 29, 1978.

Jacob Laufer, Bass, Ullman & Lustigman, New York City, for plaintiffs.

Robert B. Fiske, Jr., U. S. Atty., Peter R. Paden, Asst. U. S. Atty., New York City, Edward M. Basile, Asst. Chief Council for Enforcement, Food and Drug Division, Rockville, Md. of counsel, for defendants.

## OPINION

SAND, District Judge.

In this action, plaintiffs, two trade associations representing manufacturers, wholesalers and retailers of various food products (including protein supplements) raise a number of objections to the rulemaking procedures employed by the United States Food and Drug Administration ("FDA") related to "special dietary protein products"

and seek declaratory, injunctive and other relief.

## I. FACTUAL BACKGROUND

In the late summer of 1977, the FDA began receiving reports of deaths which might have been related to the use of special dietary protein products. At that time, these products were being used by many dieters and were attracting considerable public attention. Concerned by the reports, Dr. Allan L. Forbes, Acting Associate Director for Nutrition and Consumer Sciences, Bureau of Foods, FDA, a defendant herein, decided to investigate the safety of these products. He learned that a conference on obesity was scheduled to take place on October 20–22, 1977, at the National Institutes of Health in Bethesda, Maryland, and that the conference would be attended by a number of experts knowledgeable in this field.

On October 18, 1977, Dr. Forbes communicated with five clinicians attending the conference and two days later, met with them at the offices of the Federation of American Societies of Experimental Biology in Bethesda, Maryland. No special preparation for this meeting was requested or performed; some working papers were submitted by one conferee, Dr. George Blackburn, and a detailed memorandum of the comments and discussions was made.

On November 9, 1977, defendant Donald M. Kennedy, Commissioner of Food and Drugs, held a press conference and issued a press release, which is annexed as an exhibit to the complaint herein. He declared at that time that the FDA was aware of sixteen reported deaths and a number of severe illnesses possibly associated with the use of special dietary protein products, and expressed concern "about the liquid protein diets now so popular. These diets are being promoted in the news media and in books as a new way of reducing 'without drugs'. One in particular has been popularly advertised as the 'last chance diet' ". Press Release at 1.

Commissioner Kennedy's press release went on to state:

"What I have just said reflects not only our own views, but also the information provided by the Center for Disease Control and advice given us by leading experts in obesity and obesity control. Dr. Harold Sours, an epidemiologist with the Center for Disease Control, is here this afternoon and can answer questions about his data. Two other experts, Dr. George Blackburn of Harvard and Dr. Theodore Von Itallie of Columbia, are also with us today. Both are conducting careful studies on the uses of very low calorie diets in extremely obese people. They are finding that very low calorie diets may have some value in treating extremely fat people under very close medical supervision. Dr. Blackburn and Dr. Von Itallie are here to answer your questions about their research and about their views."

Dr. Blackburn and Dr. Von Itallie were two of the experts in attendance at the October 20, 1977 meeting at the offices of the American Societies of Experimental Biology.

The release outlined the investigation being conducted by the FDA "[i]n addition to consulting with outside experts and working with the Center for Disease Control" ("CDC"). It described a "mandatory warning label" that the FDA was developing and urged immediate voluntary compliance by manufacturers. The release stated that "our investigations and CDC's are not complete. We need to take stronger actions later on if evidence of harm continues". Press Release at 3.

On December 2, 1977, there appeared in the Federal Register an announcement signed by the defendant Commissioner which proposed certain "Food labeling warning statements for all protein supplement products". 42 F.R. 61285–61287.

The proposal included the following pertinent statements:

"This proposal would establish label warning requirements for protein supplements that may be used in weight reduction or weight maintenance programs.

The Food and Drug Administration is proposing these requirements on the basis of evidence that, without proper medical supervision, very low calorie diets consisting primarily of protein may cause serious medical problems, including death. The purposes of this proposal are to ensure that consumers are alerted to the potential health hazards associated with consumption of protein supplements for purposes of weight control and to inform consumers that the advice of a physician should be sought before using these products for weight control.

The agency is asking for the submission of any additional data relating to the safety of these products, and is also inviting comment with respect to whether the agency should take any other action concerning these products, including removing them from the market."

. . . . The Commissioner believes that large quantities of these products are being sold nationwide and that a significant number of consumers are using these products for weight control or maintenance. Diets consisting primarily of protein have been, and continue to be, widely promoted. One such diet is the subject of a best-selling book.

An *ad hoc* advisory group consisting of five clinicians internationally recognized for their studies on obesity and weight control measures met with FDA representatives on October 20, 1977 to review the safety for consumer use of the various liquid and dry preparations composed primarily of protein or protein hydrolysates. A copy of a memorandum of the meeting has been placed on file with the Hearing Clerk, F.D.A.

The advisory group reviewed and discussed several cases of illnesses and deaths which involved individuals who were apparently utilizing these protein products as their primary sources of nourishment. . . . ."

. . . . "Members of the advisory group expressed concern that promotion of these protein products did not adequately inform consumers of potential health hazards associated with protein diets, and they concluded that these protein products should not be used without careful supervision by specially trained medical personnel. The advisory group pointed out that use of very low calorie protein diets is particularly hazardous for individuals who are taking diuretics, antihypertensive drugs, oral hypoglycemic agents, insulin, adrenergic medications, corticosteroids, thyroid preparations, digitalis, or other prescribed medications and that very low calorie protein diets should not ordinarily be used with significant renal, hepatic, or cerebrovascular disease; by patients with cardiovascular disorders; by psychiatric patients with suicidal tendencies; or by infants, children, or pregnant or lactating women.

The Commissioner has considered the evidence discussed by the advisory group and is concerned that many individuals are using these protein products for weight control without any awareness of the possible consequences. The Commissioner, therefore, believes that consumers should be alerted to the potential health hazards associated with use of these products and should be informed of the need to consult a physician for advice on the appropriateness of this type of strenuous diet."

. . . . "The Commissioner advises that, instead of the warnings proposed below, he may decide to remove the products from the market, if he concludes that they present a substantial risk to public health that cannot adequately be controlled by the use of warnings. After a final rule prescribing a warning is issued, protein supplements would be misbranded under sections 403(a) and 201(n) of the Federal Food, Drug and Cosmetic Act if the label and labeling do not bear one of the prescribed warning statements."

. . . . "Therefore, under the Federal Food, Drug and Cosmetic Act (secs. 201(n), 402(a), 403(a), 505, 701(a), 52 Stat. 1041 as amended, 1046–1047 as amended, 1052–1053 as amended, 1055 (21 U.S.C. 321(n), 342(a), 343(a), 355, 371(a)) and under authority delegated to him (21 CFR 5.1), the Commissioner proposes to amend Chapter I of Title 21 of the Code of Federal Regulations in Part 101 by adding new paragraph (d) to section 101.17 to read as follows:

Section 101.17 Food labeling warning statements.

\* \* \*"

## II. PLAINTIFFS' CLAIMS AND RELIEF SOUGHT

On December 15, 1977, this suit was commenced asserting three claims: (a) that the October 20, 1977 meeting constituted a violation of the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. I (1976); (b) that the FDA violated the Administrative Procedure Act, 5 U.S.C. section 551 et seq. (1976), and its own regulations by failing to make available to the public the documentary materials upon which it relied in promulgating the challenged regulation; and (c) that the FDA is attempting to promulgate the warning label regulation without the public hearing required by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. section 301 et seq. (1976) ["FDCA"] and is doing so by failing to proceed under the proper section of the Act, which requires such a hearing.

With respect to their first claim, plaintiffs seek a declaration that the FDA's convening and continuing use of an advisory group was in violation of the FACA; an injunction against the defendants "from continuing to receive and rely on advice, information, and evidence relative to regulation of protein supplements from the aforementioned, or any other, advisory groups unless and until defendants comply with the provisions of the [FACA]"; and an injunction against the issuance of any final order in reliance upon any data submitted by the "advisory group" unless it is reconvened in accordance with the FACA.

With respect to their second claim, plaintiffs seek a declaration that the promulgation of a proposed regulation without making available for public scrutiny and comment "all of the factual and documentary background and evidence which defendants considered and relied upon, is unlawful and contrary to the provisions of 21 C.F.R. section 10.40(b)(1)(iii)"; an injunction against the issuance of any final order unless and until the FDA files with the FDA Hearing Clerk all of the "factual background data, analyses, documents, materials and evidence relied upon . . ." in promulgating the proposal for the protein supplement labeling regulations and until the public has been allowed a period of 60 days from publication of notice in the Federal Register to submit comments to the Agency.

Finally, plaintiffs seek a declaration that the proposed promulgation of the regulation without opportunity for a public hearing is contrary to law, and an injunction against the defendants' issuing a final order with respect to the labeling of protein supplements unless such final order includes a notice of opportunity for a public hearing in accordance with section 701(e) of the FDCA.

Plaintiffs moved for summary judgment on December 30, 1977. On January 4, 1978, plaintiffs filed with the FDA a "Petition for Stay of Action and Reconsideration of Agency Action". On February 1, 1978, the Government moved to dismiss, or alternatively, for summary judgment in this proceeding.

## II. DISCUSSION

It is the Government's position that certain events "subsequent to the filing of the complaint have radically altered the factual posture of the case as presented in plaintiffs' moving papers". Brief for Defendants at 11. As we examine each of plaintiffs' claims we will note such changes in the facts of the case as affect our conclusions.

### A. *Compliance with the FACA*

On the merits, the Government vigorously denies that the October 20th meeting violated the FACA. Brief for Defendants at 24. It also contends, assuming *arguendo* that "a technical violation of the FACA" did occur, that plaintiffs nevertheless are not entitled to the relief they seek. The Government asserts that the "violation" was justified by the FDA's need to act promptly in meeting its mandate to protect the public health from a perceived serious danger, and that the FDA has substantially complied with the requirements of the FACA. Brief for Defendants at 37–39.

[1] We need not decide the merits of plaintiffs' claim that the October 20th meeting comes within the requirements of the FACA, although we note the conclusion of Judge Gesell (in *Nader v. Baroody*, 396 F.Supp. 1231 (D.D.C.1975), vacated on appeal for mootness, App. No. 75–1969 (D.C. Cir. 1977)) that the FACA does not apply to informal unstructured groups. Under the facts and circumstances presented here, the discretionary relief of a declaratory judgment or an injunction is unwarranted.

1. *Injunctive Relief.* Since the filing of this action, the Government has taken several steps to alleviate whatever adverse consequences may have resulted from the October 20th meeting. First, the FDA has furnished ample assurances that the meeting was a one-time event. Brief for Defendants at 40–41, Affidavit of Allan L. Forbes, M.D., par. 11. At oral argument, plaintiffs conceded that there was no need to enjoin further meetings of *this* group of experts.

Plaintiffs also urge that we enjoin the FDA from taking final action on the labeling regulation without first convening another advisory group which does comply with the FACA. Brief for Plaintiffs at 21–22. Insofar as plaintiffs predicate their claim for relief under the FACA on the fact that non-compliance with the statute has resulted in an absence of documents, we note that the Government has advised us that all "documents made available to or prepared for or by the group of five clinicians who attended the October 20, 1977

meeting" have been filed with the FDA and, therefore, are available for public inspection and copying. Affidavit of Allan L. Forbes, M.D., par. 9. We are also advised that FDA studies are continuing, and additional data are being filed as they become available. Brief for Defendants at 12, Affidavit of Joseph P. Hile, Associate Commissioner for Compliance, FDA, par. 4–5.

We therefore conclude that there is no present need for such an injunction. The decision as to whether another advisory group is appropriate or necessary is one which the FDA should make on the basis of the present state of knowledge. We do not perceive it to be this Court's function either to make that decision or to counsel the FDA; and it would be wasteful of time and effort to mandate the convening of such a group if the FDA were to conclude that that would serve no useful purpose. Thus, we see no occasion for granting an injunction with respect to plaintiffs' first claim.

2. *Declaratory Relief.* Nor do we see a need for declaratory relief. Plaintiffs contend that, because the FDA has demonstrated a propensity to ignore the FACA, this Court should grant a declaratory judgment so that greater deference will be paid to the Act by the agency in the future. Such an approach would be singularly inappropriate under the facts of this case.

First, the FDA asserts that it acted in the good faith belief that the FACA was inapplicable. But for the perhaps unfortunate reference in the Commissioner's press release and the Notice of Proposed Rulemaking to an "advisory group", and in Dr. Forbes' notes to a "Committee", the applicability of FACA would not have assumed the magnitude of a major issue. Moreover, the meeting appears to have been a largely fortuitous result of the fact that a group of experts was convening nearby at the precise time when the FDA, alarmed by the reports it was receiving of deaths possibly attributable to protein supplement diets, was seeking expert guidance under considerable time pressures. Given these facts, declaratory relief for the purpose of admonishing compliance with the FACA, if it should apply in some future context, seems unnecessary and unwarranted.

B. *Non-Disclosure of Documentary Materials*

The Government asserts that, since the commencement of this litigation, all available relevant material information has been made available to the public and plaintiffs, and that as additional documentation is developed through ongoing studies conducted by FDA (or CDC), it is also being made public. Brief for Defendants at 12, Affidavit of Joseph P. Hile at par. 5. The Government thus argues that this aspect of the case has become moot.

At oral argument of these motions, plaintiffs contended that the claim was not mooted, since (a) had the FDA acted in compliance with the FACA, certain documentation (including especially a transcript of the proceedings) would have come into existence; (b) that FDA officials failed to record telephone conversations upon which they may have relied; and (c) that certain handwritten notes prepared for their personal use by participants at the October 20th meeting other than Drs. Forbes and Von Itallie had not been furnished plaintiffs.

As to plaintiffs' first two points, it need hardly be stated that this Court cannot order into existence documents which in fact did not exist at the relevant times. If a conversation forms the basis for agency action, it should of course be revealed and documented in some way. It would be inappropriate for a court, however, to require agency officials to prepare memoranda of every telephone conversation. Moreover, there is no indication in this case that the undocumented conversations were relied on as a basis for agency action.

With regard to plaintiffs' third point, the Government has made available the handwritten notes of two other participants at the October 20th meeting, and has stated that no other participants prepared such notes. Affidavit of Victor P. Frattali, Assistant to the Associate Director for Nutrition and Consumer Sciences, FDA.

■ Thus, the FDA having made available all existing relevant and material documents and all documents upon which it relied, Count II of plaintiffs' complaint has indeed become moot.

C. *The Requirement of a Public Hearing*

Plaintiffs contend that the FDA is required to hold a public hearing before promulgating its proposed labeling rule. It is the FDA's present position that it is not required to do so. Affidavit of William F. Randolph, Acting Associate Commissioner of Regulatory Affairs, FDA, par. 3.

The statutory provisions at issue are sections 403(a) and 403(j) of the FDCA, 21 U.S.C. sections 343(a), (j) (1976). Section 403(a) provides as follows:

"A food shall be deemed to be misbranded—(a) If its labeling is false or misleading in any particular."

Section 403(j) provides as follows:

"A food shall be deemed to be misbranded—(j) If it purports to be or is represented for special dietary uses, unless its label bears such information concerning its vitamin, mineral, and other dietary properties as the Secretary determines to be, and by regulations prescribes as, necessary in order fully to inform purchasers as to its value for such uses."

If the FDA's proposed regulation is promulgated pursuant to section 403(a), the agency may proceed by informal "notice and comment" procedures, FDCA section 701(a), 21 U.S.C. section 371(a), and the resulting regulation is subject to a limited judicial review, i. e., to determine whether the regulation is reasonably related to the purposes of the statute. If, however, the agency may promulgate its proposed regulation only pursuant to section 403(j), it must proceed by holding a public hearing, FDCA section 701(e), 21 U.S.C. section 371(e), and the scope of judicial review is broader, i. e., to determine whether the regulation is supported by substantial evidence. Furthermore, only the public hearing procedure affords the plaintiffs an opportunity for cross-examination. 5 U.S.C. section 556(d) (1976).

This Court need not decide the merits of plaintiffs' contentions with respect to the requirement of a public hearing, however,

as we agree with the Government's contention that plaintiffs' claim is premature in that plaintiffs have failed to exhaust their administrative remedies.

Plaintiffs assert that they *have* exhausted their administrative remedies, in that the FDA has in fact taken final action on their demand for a public hearing. They based this assertion on the following set of facts: as noted above, on January 4, 1978, plaintiffs petitioned the FDA for a "Stay of Action and Reconsideration of Agency Action". Supplemental Affidavit of Jacob Laufer, Exhibit A. By letter dated March 30, 1978, the FDA refused to rule on the substantive merits of plaintiffs' petition, and stated: "This letter constitutes the final action on your Petition except insofar as the substantive issues will be discussed in the preamble to the tentative final order." Supplemental Affidavit of Jacob Laufer, Exhibit B. On August 1, 1978, subsequent to oral argument on these motions, the Government stated that "[t]he tentative final order will state in substance that it is FDA's present position that the agency is not required to hold a public hearing in conjunction with the promulgation of the proposed regulation. The tentative final order will further state the reasons for that finding and respond to comments submitted on that issue". Affidavit of William F. Randolph, Acting Associate Commissioner for Regulatory Affairs, FDA, par. 3.

Plaintiffs contend that this statement, taken together with the FDA's response to their Petition, is in effect final agency action regarding the requirement of a hearing, and is therefore subject to judicial review at this time. Letter from Jacob Laufer to the Court, August 11, 1978.

■ Whether or not an agency action is "final" is to be determined "in a pragmatic way". *National Automatic Laundry & Cleaning Council v. Schultz,* 143 U.S.App. D.C. 274, 286, 443 F.2d 689, 701 (1971). Where an agency ruling does not indicate on its face that it is tentative, there is a presumption that it is final. *Id.* That presumption may be negated, however, where "the agency adopted a rule prescribing its procedure in such a way as to identify certain actions as tentative and subject to reconsideration, prescribing the means of obtaining such reconsideration", or where the agency head advises the court "that the ruling in question was tentative, and outlining the method of seeking reconsideration." *Id.*

■ In this case, we note that the FDA has expressly stated that its decision with respect to the requirement of a hearing is tentative. In the same post-argument Affidavit quoted above, the FDA's Acting Associate Commissioner for Regulatory Affairs continued: "This portion of the tentative final order . . . will, however, be subject to a second round of comments so that interested parties will have an additional opportunity to persuade the agency that a hearing is required to be held and/or that, even if a hearing is not required, a hearing should be held. The agency is required to, and will give good faith consideration to such comments." Affidavit of William F. Randolph, par. 3.

We, therefore, reject plaintiffs' contention that the FDA has made a "clear-cut decision that a 403(j) hearing is not *required* by law." Letter from Jacob Laufer to the Court, August 11, 1978. (emphasis in original). The FDA may, in fact, accept plaintiffs' contention that a hearing is required; it may decide to hold a hearing as a matter of agency discretion; finally, regardless of whether it holds a hearing, it may decide not to promulgate the challenged regulation, in which case plaintiff will have suffered no injury.

The requirement that plaintiffs exhaust their administrative remedies "is based on the need to allow agencies to develop the facts, to apply the law in which they are peculiarly expert, and to correct their own errors. The rule ensures that whatever judicial review is available will be informed and narrowed by the agencies' own decisions . . . often the agency's ultimate decision will obviate the need for judicial intervention." *Schlesinger v. Councilman,* 420 U.S. 738, 756–57, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975); *McKart v. United States,* 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969).

■ There is a recognized exception to the exhaustion requirement: a district court may intervene in pending agency proceedings where the agency's action is taken "in excess of delegated powers". *Leedom v. Kyne,* 358 U.S. 184, 190, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). As the Court of Appeals stated in *Sterling Drug, Inc. v. Weinberger,* 509 F.2d 1236, 1239 (2d Cir. 1975): ". . . the most that can be extrapolated from *Leedom v. Kyne* is that an injunction may be issued 'if an agency refuses to dismiss a proceeding that is plainly beyond its jurisdiction as a matter of law or is being conducted in a manner that cannot result in a valid order' ". That situation does not obtain here.

Thus, we dismiss counts one (FACA) and three (public hearing) as not presenting a proper case for declarative or injunctive relief; we dismiss count two (document disclosure) on the grounds of mootness. This dismisses the action in its entirety.

SO ORDERED.