The **NATIONAL NUTRITIONAL FOODS ASSOCIATION** and Protein Products Association, Plaintiffs-Appellants,

v.

Joseph A. **CALIFANO,** Jr., Secretary of Health, Education and Welfare, Donald M. **Kennedy,** Commissioner of Food and Drugs, and Allan L. **Forbes,** M.D., Acting Associate Director for Nutrition and Consumer Sciences, Bureau of Foods, Defendants-Appellees.

No. 907, Docket 78–6171.

United States Court of Appeals, Second Circuit.

Argued May 30, 1979.

Decided June 27, 1979.

Jacob Laufer, New York City (Bass, Ullman & Lustigman, New York City, Milton A. Bass, Steven R. Trost and Joan Licht Mantel, New York City, of counsel), for plaintiffs-appellants.

Peter R. Paden, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S.D.N.Y., Peter C. Salerno, Asst. U. S. Atty. and Richard M. Cooper, Chief Counsel, Rockville, Md., and Edward M. Basile, Associate Chief Counsel for Enforcement, Food and Drug Administration, Washington, D.C., of counsel), for defendants-appellees.

Before MOORE, FRIENDLY and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

This is an appeal from an order of the District Court for the Southern District of New York, 457 F.Supp. 275 (1978), in an action by two trade associations whose members manufacture and sell protein supplements against the Secretary of Health, Education and Welfare, the Commissioner of Food and Drugs, and the FDA's Acting Associate Director for Nutrition and Consumer Sciences, Bureau of Foods. Federal jurisdiction rests on 28 U.S.C. §§ 1331 and 1337. The action concerns FDA rulemaking designed to require warnings for protein supplements and other preparations that may be used as the sole or primary source of calories in order to lose weight. Plaintiffs' complaints are that the FDA is proceeding under § 403(a) of the Food, Drug and Cosmetics Act, which calls only for notice and comment procedure, rather than under § 403(j), which, by virtue of § 701(e), would entitle plaintiffs to a "hearing" of the traditional type, and that the FDA relied on the advice of a committee not constituted in compliance with the Federal Advisory Committee Act (FACA), 5 U.S.C. App. I, Pub.L. No. 92–463, 86 Stat. 770 (1972). In a considered opinion Judge Sand denied relief without reaching the merits on either issue. Although we affirm, we believe a more detailed statement of the facts (some subsequent to the district court's opinion) and a more elaborate discussion of the law will be useful.

I.

According to plaintiffs' assertions, which we will recount to place the issues in setting but without implication as to their correctness, one way or the other, there is more to the controversy than a reading of the proposed regulations, 42 F.R. 61285 (1977), or the Tentative Final Rule (TFR), 43 F.R. 60883 (1978), reveals. The story as told in their brief, based on an affidavit of David Blechman, president of plaintiff Protein Products Association, and of Twin Laboratories, Inc., a seller of liquid protein products, and other materials before the district court, is as follows:

Liquid protein products have been available for direct retail sale to the consuming public for at least 12 years. Within the last five years new medical research has suggested the usefulness of a modified fasting diet, supplemented by protein, vitamins and minerals, in alleviating obesity. Prominent in this "Protein Sparing Modified Fast" (PSMF) research was Dr. George L. Blackburn of the Harvard University Medical School, who is Director of the Center for Nutritional Research in Boston.

At first the use of liquid proteins as an aid in the management of obesity was limited to experimental research and to sales through physicians. Some of these formed the American Society of Bariatric Physicians (ASBP); physician demand for the product was met promptly by a company known as Control Drugs, Inc. Rivalry developed between Twin Laboratories and Control Drugs over the former's efforts to invade the physician market and to continue to make the product directly available to the public at retail outlets.

The controversy was heated by the publication in late 1976 of "The Last Chance Diet" by Robert Linn, a doctor of osteopathy, which popularized the use of liquid protein products for diet control. The ASBP attacked the new widespread and uncontrolled use of PSMF programs and urged its members to help with the problem, through such means as writing letters to newspapers. However, the ASBP continued to advocate physician monitored programs using products manufactured by Control Drugs.

Primary responsibility in the FDA for products such as those manufactured and sold by plaintiffs lay in Dr. Allan Forbes, Acting Associate Director for Nutrition and Consumer Sciences in the Bureau of Foods. In the spring of 1977 he and Dr. Blackburn

had various conversations about Dr. Linn's book and the consequent popularity of liquid food protein products, including Dr. Blackburn's attempts to dissuade Dr. Linn from publishing. In a letter to Dr. Forbes dated May 25, 1977, Dr. Blackburn suggested that the Bureau of Foods might become involved. During the summer of 1977, the FDA received a report of a death believed to be associated with the use of liquid protein products in dieting; a second death was reported in September. At a conference of FDA officials held on or before October 3, 1977, it was decided, among other things, "to obtain the advice of experts in the field of obesity research among whom are Dr. George L. Blackburn, Dr. Theodore B. Van Itallie, and Dr. Sanford A. Miller." Mr. Blechman averred that, at a symposium of the ASBP on October 7, Dr. Blackburn stopped at Twin Laboratories' booth, pointed to the display of products freely available in retail outlets, and said "We are going to get rid of this." [1]

Later in October, Dr. Forbes learned that a conference on obesity was scheduled to take place on October 20–22, 1977, at the National Institutes of Health in Bethesda, Md., near the FDA's headquarters. Between October 18 and 20 he communicated with five clinicians who were attending the conference [2] and arranged for them to meet with him and six other FDA officials on the afternoon of October 20 at the Federation of American Societies for Experimental Biology, also in Bethesda. No special preparation for the meeting was requested, but Dr. Blackburn submitted some working papers. An official of FDA later prepared a detailed memorandum of the meeting.

The memorandum recites that the "ultimate purpose for the meeting" was to assist the FDA in selecting the best course of action "for regulating the production and

---

1. In recounting this and other claims of the plaintiffs, we do not remotely suggest any impropriety in action by Dr. Blackburn and other physicians to advance a sincere belief that the uncontrolled sale of liquid proteins as an aid in reducing obesity was hazardous; this would be their professional obligation. The material is relevant to plaintiffs' claim, discussed in Part

III of the opinion, that the FDA chose, whether deliberately or inadvertently, to bypass FACA by hearing only one point of view.

2. To wit, Drs. Blackburn, Van Itallie, Genuth, Marliss and Drenick. The names were suggested by Dr. Van Itallie, and none except Dr. Blackburn is a member of ASBP.

promotion of [protein products used for weight reduction] and/or informing the public of their hazard potential." It described the five physicians as an "ad hoc advisory group." Dr. Forbes announced the FDA's intent "to take appropriate actions to alert the public on the safe use of protein products for weight control purposes and to recommend interim cautionary label statements to manufacturers and distributors prior to formal rule-making relative to labeling." Eleven case histories terminating in death were examined "because of a possible link with adherence to a modified fast regimen." Although "[t]he cause-and-effect relationships with regard to these deaths have not yet been established . . there is sufficient information to indicate that protein products for weight reduction require prudent use." This is followed by nine points on which all members of the ad hoc group agreed; the gist of these was that certain types of persons should not use protein products as part of a PSMF at all and that such products are not suitable for use in the absence of careful supervision by medical personnel trained in their use. The group recommended that protein products used in weight reduction programs be required to carry a label reading:

Do not use for weight reduction or maintenance without medical supervision. Do not use without medical advice if you are taking prescribed medications. Not for use by infants, children, or pregnant or nursing women.

The memorandum concluded by saying:

The members of the ad hoc advisory group have graciously agreed to provide further assistance to FDA as the need may arise.

On November 9, 1977 the Commissioner of Food and Drugs held a press conference and issued a press release on the subject of protein supplements used to fight obesity. He declared the FDA was aware of 16 reported deaths and a number of severe illnesses possibly associated with the use of such products and expressed special concern about "the liquid protein diets now so popular", which were being promoted in the news media and in books such as Dr. Linn's. He said that his statements reflected not only the views of the FDA but also "the information provided by the Center for Disease Control and advice given us by leading experts in obesity and obesity control", two of whom, Drs. Blackburn and Van Itallie, see note 2, were present and could answer questions.

As should have been expected, this publicity resulted in a drastic decline in the sale of protein products for use in weight reduction. On December 2, 1977, the FDA gave notice of a proposed rule, 42 F.R. 61285, whereby protein supplements intended for use in weight reduction or maintenance programs would be required to bear the following warning:

WARNING.—Very low calorie protein diets may cause serious illness or death. DO NOT USE FOR WEIGHT REDUCTION OR MAINTENANCE WITHOUT MEDICAL SUPERVISION. Do not use for any purpose without medical advice if you are taking medication. Not for use by infants, children, or pregnant or nursing women.[3]

The notice relied heavily on the October 20 meeting with the ad hoc advisory group, which was described in detail, and the memorandum of the meeting was placed on file with the Hearing Clerk. The authority cited for the proposed rulemaking was §§ 201(n), 402(a), 403(a), 505 and 701(a) of the Food and Drug Act. The notice stated that the Commissioner was also considering "whether the risk to human health presented by these products is so great that he should seek to remove some or all of them from the market, instead of requiring warnings." He sought scientific comment on the merits and legal comment "on the most appropriate statutory basis for a partial or total ban." Comments were required by

---

**3.** Protein products not intended for use in weight reduction or maintenance would be required to bear the following warning:

WARNING.—Very low calorie protein diets may cause serious illness or death. DO NOT USE FOR WEIGHT REDUCTION OR MAINTENANCE.

January 3, 1978; the proposed effective date of a final rule emanating from the proposal would be 30 days after publication in the Federal Register.

Shortly after plaintiffs began this action on December 15, 1977, they moved for a preliminary injunction to stay implementation of the proposed regulations which they deemed illegal in the absence of the hearing required by §§ 403(j) and 701(e) and as a result of use of an unlawful advisory committee; they also sought access to documents underlying the FDA's proposal. On January 4, 1978, they petitioned the FDA for release of the documents and for an announcement that a trial-type hearing would be held before the rules would become effective. The FDA agreed to release most of the underlying data and stipulated that a final rule would not be issued until after an interim announcement and further opportunity for comment.

The FDA thereupon moved for summary judgment. It contended that, as apparently is not denied, the issue with respect to the documents had been mooted, and that there was no basis for issuing an injunction under FACA, particularly in light of FDA's agreement that the ad hoc advisory group would not be reconvened and would not serve any further formal role in the promulgation of the protein supplement regulations. It urged finally that it was justified in proceeding under § 403(a) and that plaintiffs had not exhausted their administrative remedies on that score, particularly because of the pendency of the pertinent portion of plaintiffs' petition of January 4, 1978. This last reason was removed when, on March 20, 1979, the FDA refused to rule on that portion of the petition, stating that:

this letter constitutes the final action on your petition except insofar as the substantive issues will be discussed in the preamble to the tentative final order,

which was expected to be issued "in the next few weeks." On August 29, 1978, with no TFR yet issued, Judge Sand filed his opinion and order dismissing the complaint.

After plaintiffs had appealed to this court, the long awaited TFR appeared on December 29, 1978, 43 F.R. 60883. Basically the warning requirements remained unchanged. The bulk of the TFR was devoted to discussing the significance of the evidence of the adverse consequences of uncontrolled use of protein supplements to relieve obesity. The conclusions were:

That it is potentially impossible to establish the cause-and-effect relationship unequivocally (i. e., that a thorough understanding of the basic mechanism at work may not be obtained) should not divert attention from the rather clear evidence described above that reliance on very low calorie protein diets to lose weight is dangerous.

The standards used by public health officials, physicians, and others to conclude, to a scientific certainty, that a cause-and-effect relationship exists are appropriately rigorous. Those same standards do not apply, however, when the question is whether an agency such as FDA, charged with the responsibility of protecting the public health—a responsibility that includes ensuring that consumers are fully apprised of risks inherent in various products—should adopt a rule that requires that warnings about the products be provided on their labels. This is not to say that an agency is free to act in the absence of competent scientific evidence. Rather, it is appropriate and responsible for an agency to mandate that consumers be provided with information or warnings about the use of products when, as is the case here, the evidence strongly suggests a definite relationship between the use of a product and death. 43 F.R. 60885 (1978)

To no one's surprise the FDA ruled that it could properly proceed under § 403(a), 43 F.R. 60888, and that it had not violated FACA, 43 F.R. 60889. Further comments would be received until February 27, 1979; the proposed effective date of a final rule would be 60 days after publication in the Federal Register. At this writing no final rule has yet been issued.

## II.

We deal first with appellants' claim that the FDA should be enjoined from proceeding further with the rulemaking unless it agrees to follow the procedure prescribed in § 701(e) of the Act for the issuance of a regulation under § 403(j).[4] Summarily stated, this procedure is as follows: Rulemaking under § 701(e) begins, like rulemaking under § 553 of the Administrative Procedure Act, with the publication of a proposal and an opportunity for written or oral comments. After considering these, the agency publishes an order, which may not become effective until the day following the last day on which objections may be filed under § 701(e)(2). That section sets a 30-day period in which any person who will be adversely affected if the order goes into effect may file objections and request a public hearing thereon. Any ensuing order "shall be based only on substantial evidence of record at such hearing and shall set forth . . . detailed findings of fact on which the order is based." It has long been understood that the public hearing so required is a trial-type hearing, see 1 Davis, Administrative Law Treatise § 6.06 (1958); *National Nutritional Foods Ass'n v. Food and Drug Administration,* 504 F.2d 761, 793 (2 Cir. 1974), *cert. denied,* 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975); *Pactra Industries, Inc. v. Consumer Products Safety Comm'n,* 555 F.2d 677, 685 (9 Cir. 1977); *United States v. Florida East Coast Railway Co.,* 410 U.S. 224, 237 n. 38, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973) (dictum). But cf. Davis, Administrative Law of the Seventies § 6.06 at 223 (1976). The FDA contends that this procedure is not mandated here since the agency need not draw upon the authority conferred

by § 403(j) but had adequate power to issue the proposed warning regulation under § 403(a)(1) which provides that a food shall be deemed to be misbranded if "its labeling is false or misleading in any particular," a phrase which is given content by § 201(n), quoted in the margin.[5] More immediately the FDA argues that we should not even consider the question until a final regulation has been promulgated.

*Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638 (1938), decided before enactment of the APA, established a general approach of nonintervention by courts prior to final agency action. This principle, designed to avoid delay of administrative procedures, was codified in the Administrative Procedure Act, 5 U.S.C. § 704, which provides judicial review for "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court . . . ." *Leedom v. Kyne,* 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958), gave birth to a narrow exception to this, expanded in *McCulloch v. Sociedad Nacional de Marineros,* 372 U.S. 10, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963), in cases where the proposed agency action was plainly beyond its powers or, even when the impropriety of the action was not so plain, the very conduct of the proceeding would adversely affect important national interests. See *Empresa Hondurena de Vapores, S.A. v. McLeod,* 300 F.2d 222, 228–29 (2 Cir. 1962), vacated as governed by *McCulloch,* 372 U.S. at 22, 83 S.Ct. 671. We applied the *Myers* principle in *Pepsico, Inc. v. FTC,* 472 F.2d 179 (2 Cir. 1972), *cert. denied,* 414 U.S. 876, 94 S.Ct. 44, 38 L.Ed.2d 122 (1973), and *Sterling Drug, Inc. v. Weinberger,* 509 F.2d 1236

---

4. Section 403(j) provides that a food shall be deemed to be misbranded:

  (j) If it purports to be or is represented for special dietary uses, unless its label bears such information concerning its vitamin, mineral, and other dietary properties as the Secretary determines to be, and by regulations prescribes as, necessary in order fully to inform purchasers as to its value for such uses.

5. (n) If an article is alleged to be misbranded because the labeling is misleading, then in determining whether the label is misleading

there shall be taken into account (among other things) not only representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling relates under the conditions of use prescribed in the labeling thereof or under such conditions of use as are customary or usual.

(2 Cir. 1975), and the *Leedom-McCulloch* exception in *Central Hudson Gas & Electric Corp. v. EPA,* 587 F.2d 549 (1974), and *Touche Ross & Co. v. SEC,* Docket No. 78–6095, decided May 10, 1979. As explained in *Pepsico, Inc. v. FTC, supra,* and *Sterling Drug, Inc. v. Weinberger, supra,* the *Leedom* exception applies, save in the rare situation exemplified by *McCulloch,* only "if an agency refuses to dismiss a proceeding that is plainly beyond its jurisdiction as a matter of law or is being conducted in a manner that cannot result in a valid order." *Pepsico, Inc. v. FTC, supra,* 472 F.2d at 187. The drastic limitations stated in these criteria are designed to keep the exceptions from swallowing the *Myers* rule and avoid a reviewing court's having to devote undue time to a debatable issue which may never arise in practice because of the agency's decision on the merits or may be illuminated, if it does, by the agency's discussion. Here it is not at all clear that appellants' legal position on the applicability of §§ 403(j) and 701(e) is sound. Appellants do not, indeed cannot, challenge that the FDA has power under § 701(a) to issue substantive rules to implement § 403(a), see *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973); *Ciba Corp. v. Weinberger,* 412 U.S. 640, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973); *Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973); *U. S. V. Pharmaceutical Corp. v. Weinberger,* 412 U.S. 655, 93 S.Ct. 2498, 37 L.Ed.2d 244 (1973). Applying these decisions we have recognized that notice and comment procedures were sufficient in promulgating a regulation which, among other things, required appropriate disclosure and warnings on high dosage preparations of vitamins A and D. *National Nutritional Foods Ass'n v. Weinberger,* 512 F.2d 688 (2 Cir.) *cert. denied,* 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 445 (1975). If one looks only to the language of the two subsections, it is not apparent that the grant of power under § 403(j) to require "statements concerning its [a food for special dietary use] vitamin, mineral, and other properties which fully inform the purchaser as to its nutritional value" when "necessary for the protection of the public health" curtails the power to issue regulations requiring warnings that could be compelled for other foods and drugs under the joint force of §§ 403(a) and 201(n). See *National Nutritional Foods Ass'n v. Weinberger, supra,* 512 F.2d at 697; *National Nutritional Foods Ass'n v. Food and Drug Administration, supra,* 504 F.2d at 799–800. We refrain from saying more in order to avoid prejudicing appellants in a later action where the issue will be whether the FDA's choice of procedure was wrong rather than, as here, whether it was so plainly wrong that we should abort final action, at a time when the limits of the final action are not yet fully known.[6]

While appellants have much to say about *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), see also *Gardner v. Toilet Goods Ass'n,* 387 U.S. 167, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967), these decisions are inapposite. There the agency had completed its rulemaking activity; the question was whether parties adversely affected could immediately attack the assertedly invalid regulations or must either comply with them or await enforcement activity, both courses involving large cost and expense. In such cases, as said by Justice Harlan, "the impact of the regulations upon the petitioner is sufficiently direct and immediate as to render the issue appropriate for [immediate judicial] review," 387 U.S. at 152, 87 S.Ct. at 1517. The limited scope of those two decisions was illustrated by the contrary result reached in the third of the trilogy, *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967). We have

---

**6.** A further factor militating against intervention at this time is that although the district court rendered its decision on August 24, 1978, and we could have heard an expedited appeal in October of that year, appellants did not request this and did not file their brief until March 8, 1979, more than two months after the TFR had been issued and after the period for comment had expired.

followed *Abbott Laboratories* in *Finnerty v. Cowen*, 508 F.2d 979 (1974), and *Diapulse Corp. v. FDA*, 500 F.2d 75, 77 (1974).

*Abbott Laboratories* and its progeny have no application here. When the case was decided by the district court, no TFR had even been formulated. At the time of argument before us no final order had yet been issued. If the case is governed by § 701(e), as appellants assert, the FDA must still issue final regulations before the right to demand a public hearing arises. Appellants' concern is that the final order will in fact be final in the sense that it will not contain the provisions, which § 701(e) would mandate if applicable, for a delay of thirty days during which appellants could obtain an automatic stay by filing objections which request a public hearing. Unless a stay is granted by the FDA, they will thus be forced to seek one in an action in a district court, see *National Nutritional Foods Association v. Food and Drug Administration, supra,* 504 F.2d at 771–74, which no one denies they can initiate under *Abbott Laboratories.* For us to relieve them of this before the agency has even acted, would be the very course which is condemned by *Myers* unless within the *Leedom* exception. Nothing in *Abbott* or the cases following it would justify our doing this.

### III.

Appellants contend that the meeting of October 20, 1977, was of an advisory committee as defined in FACA, 5 U.S.C. App. I, Pub.L. No. 92–463, 86 Stat. 770 (1972) and did not comply with the Act and the FDA's regulations thereunder, 21 C.F.R. §§ 14.1 *et seq.*, in several respects. The FDA gave no notice of the meeting as required by 21 C.F.R. § 14.20 and § 10(a)(2) of the Act. No advisory committee charter was filed as required by § 9(c). The meeting was not open to the public, nor were interested persons given any opportunity to appear before the committee or file statements with it, as required by § 10(a)(1) and (3). Most important, appellants claim that appointment of a group composed solely of physicians, understandably leaning in favor

of medical supervision of the use of protein supplements to conquer obesity, did not comply with § 5(b)(2) and (3), made applicable to agencies by § 5(c), which require that membership of an advisory committee "be fairly balanced in terms of the points of view represented and the functions to be performed" and that suitable provision be made to assure that advice and recommendations "will not be inappropriately influenced . . . by any special interest." The FDA's principal answer is that the group convened on October 20 was not an advisory committee within the meaning of FACA. The district court avoided deciding this on the basis that, in view of FDA's undertaking not to reconvene the committee, there was no need for an injunction, and that the issue was not appropriate for declaratory relief.

Section 3(2) of the Act provides, so far as here pertinent, that "The term 'advisory committee' means any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee, or other subgroup thereof" established or utilized by an agency "in the interest of obtaining advice or recommendations" for the agency. The Senate report, No. 92–1098, 92d Cong. 2d Sess., reprinted in the Source Book on FACA, 95th Cong. 2d Sess., p. 158, said of a substantially identical provision in the Senate bill, differing in that it used the words "established or organized":

> The intention is to interpret the words "established" and "organized" in their most liberal sense, so that when an officer brings together a group by formal or informal means, by contract or other arrangement, and whether or not Federal money is expended, to obtain advice and information, such group is covered by the provisions of this bill.

Although the source of the definition seems to have seen the Bureau of the Budget Circular No. A 63, dealing with inter-agency committees, which spoke of "any *formally constituted* committee, board, commission, council, conference, panel, task force or other similar group, or any subcommittee

or other subgroup thereof" (emphasis supplied), Source Book, 111, Congress deleted the phrase we have italicized.[7]

As against these indications of coverage sufficiently broad to include the October 20 meeting, a joint memorandum of the OMB, to which § 7 of the Act confides special responsibilities, and the Department of Justice, 38 F.R. 2306 (1973), contained an explanation, quoted in *Nader v. Baroody*, 396 F.Supp. 1231, 1233 n.4 (D.D.C.1975), that would exclude it. However, the joint memorandum was rescinded by OMB's Advisory Committee Management Guidance Circular of March 27, 1974, 39 F.R. 12389, which offered no help on the definitional problem. The FDA's regulations, § 14.1(5), add this:

> (5) An advisory committee shall ordinarily have a fixed membership, a defined purpose of providing advice to the agency on a particular subject, regular or periodic meetings, and an organizational structure, e. g., a chairman and staff, and shall serve as a source of independent expertise and advice rather than as a representative of or advocate for any particular interest.
>
> (i) A group of persons convened on an ad hoc basis to discuss a matter of current interest to the agency, but which has no continuing function or organization, does not involve substantial special preparation, and does not as a group issue a report to or advise the agency, is not an advisory committee.
>
> (ii) A group of two or more agency consultants meeting with the agency on an ad hoc basis is not an advisory committee.

Subparagraph (i), if valid, would exclude the October 20 meeting—except for the important fact that the group *did* advise the agency.

In the long run the Government's argument that the October 20 meeting was not within FACA rests mainly on what it conceives to be common sense. An agency dealing with technical matters ought to be able to get the advice of highly qualified technicians in the private sector before it even initiates proceedings or takes other action, and to get this speedily and informally. Yet the OMB guidelines require that before creating a new advisory committee, an agency must first consult with the OMB secretariat and, if the OMB concurs, a process that may be time consuming, must publish in the Federal Register a certification of need and a description of the nature and purpose of the committee at least 15 days (unless that period is shortened by the OMB secretariat) before the filing of the committee's charter, 39 F.R. 12389, which under § 9(c) of the Act, is a precondition to the committee's meeting. Congress, the Government argues, could not have intended to place such obstacles in the way of what proved to be a one-time meeting, even though there may have been an intention to hold more, especially in a case like this where the Commissioner was "considering whether the risk to human health presented by these products is so great that he should seek to remove some or all of them from the market, instead of requiring warnings." 42 F.R. 61286.[8]

The two most relevant reported decisions are *Food Chemical News, Inc. v. Davis*, 378 F.Supp. 1048 (D.D.C.1974), holding that two separate "informal" meetings with consumer and distilled spirits industry representatives with respect to the drafting of proposed regulations of the Bureau of Alcohol, Tobacco and Firearms of the Treasury Department were meetings of advisory com-

7. Congress also chose not to follow the example of § 1(4) of Executive Order 11671, dated June 5, 1972, which defines "Committee" to mean "any committee, board, commission, council, conference, panel, task force, or other similar group or body established to meet *on a recurring basis* to provide advice or recommendations." (emphasis supplied) Source Book, 334.

8. For differing views as to the applicability of FACA to one-time meetings, see Tuerkheimer, Veto by Neglect: The Federal Advisory Committee Act, 25 Am.U.L.Rev. 53, 67–68 (1975), and Marblestone, The Coverage of the Federal Advisory Committee Act, 35 Fed.Bar J. 119 (1976).

mittees,[9] and *Nader v. Baroody*, 396 F.Supp. 1231 (D.D.C.1975), holding that fortnightly meetings between officials of the executive branch and a wide variety of industry organizations and citizens were not. Agreeing with both results, we find *Food Chemical News* to be more nearly in point. One factor weighing heavily with us is that the Commissioner leaned so strongly on the advisory group in his press release and, even more so, in his proposed regulation, see 42 F.R. 61285–86. If an agency wishes to rely publicly on the backing of an advisory committee, it must do what the statute commands. Such a situation directly implicates the concern Congress addressed in § 5(b)(2) and (3) of the Act, that agency action might be dominated by one particular viewpoint.[10] Some two months elapsed between the initial plan for the meeting and the publication of the proposal, in which the advisory group was mentioned on four occasions. Even if the calling of the meeting without reference to FACA was a pardonable inadvertence, there was ample time for compliance before December 7. All things considered, we believe this to be a situation wherein Congress meant FACA to apply. If the straitjacket is too tight, Congress is free to loosen it.

The question of remedy remains. So far as we are aware, no court has held that a violation of FACA would invalidate a regulation adopted under otherwise appropriate procedures, simply because it stemmed from the advisory committee's recommendations, or even that pending rulemaking must be aborted and a fresh start made. We perceive no sound basis for doing so. Applicable rulemaking procedures afford ample opportunity to correct infirmities resulting from improper advisory committee action

prior to the proposal. In this we are in accord with *Center for Auto Safety, Inc. v. Temann*, 414 F.Supp. 215, 226 (D.D.C.1976), *remanded on other grounds*, 188 U.S.App. D.C. 426, 580 F.2d 689 (1978). We likewise cannot fault the district judge for concluding that, in light of the Government's agreement not to reconvene this particular group, there was no need for an injunction. Whether it was proper to deny declaratory relief is a closer question. The judge justified this on the ground that the FDA was acting on a good faith belief that the advisory group was not within FACA and that the calling of the meeting was "a largely fortuitous result of the fact that a group of experts was convening nearby at the precise time when the FDA, alarmed by the reports it was receiving of deaths possibly attributable to protein supplement diets, was seeking expert guidance under considerable time pressures." 457 F.Supp. at 280. Given the wide discretion afforded district judges by the Declaratory Judgment Act, 28 U.S.C. § 2201, see *Public Service Comm'n v. Wycoff Co.*, 344 U.S. 237, 241, 243–44, 73 S.Ct. 236, 97 L.Ed. 291 (1952), we cannot say that this was an abuse. In any event this opinion gives appellants substantially the same relief as a declaratory order.

Affirmed.

---

**9.** *Aviation Consumer Action Project v. Yohe*, Docket No. 73–707 (D.D.C. June 24, 1973), *appeal dismissed* No. 74–1903 (D.C.Cir. Jan. 29, 1974), see Source Book p. 343, and Tuerkheimer, *supra* 25 Am.U.L.L.Rev. at 68, is apparently to the same effect.

**10.** Courts have considered the directness of the relationship between the alleged advisory committee and government action as a factor in determining whether an advisory committee exists. Compare *Nader v. Baroody, supra*, 396

F.Supp. at 1234, with *Food Chemical News v. Davis, supra*, 378 F.Supp. at 1050. See also *Center for Auto Safety v. Cox*, 188 U.S.App. D.C. 426, 431, 580 F.2d 689, 694 (1978) (requiring district court to narrow its order so that it covers only the particular facts involved, "consultation . . . in the interest of obtaining advice or recommendations . . . on proposed regulations," and not simply any future contact between the group and the government agency).