**NATURAL RESOURCES DEFENSE COUNCIL, INC., Plaintiff,**

v.

**John S. HERRINGTON, et al., Defendants.**

No. 86–1398.

United States District Court, District of Columbia.

June 11, 1986.

---

Dan W. Reicher, Ronald J. Wilson, Washington, D.C., for plaintiff.

Mary E. Goetten, Washington, D.C., for defendants.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

Plaintiff Natural Resources Defense Council, Inc. ("NRDC"), a non-profit environmental protection organization, invoked the Federal Advisory Committee Act ("FACA" or "Act"), 5 U.S.C. App. II §§ 1–15, to gain admission to all collective activities of six scientist-executives convened last month by the Secretary of Energy to study the safety of a government-owned nuclear reactor currently in operation in the state of Washington. Denied access by the defendants, the Secretary and the Department of Energy ("DOE" or "Department"), NRDC now sues to enjoin those activities altogether until its representatives are allowed to attend, and defendants comply with certain other requirements of the Act as well.[1]

The case is presently before the Court on plaintiff's motion for a preliminary injunction and defendants' cross-motion for summary judgment. The material facts appear of record and are not in dispute. For the reasons hereinafter set forth, the Court will deny plaintiff's application for a preliminary injunction, grant defendants' mo-

---

1. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361.

tion for summary judgment, and dismiss the complaint with prejudice.

### I.

The litigation was provoked by a DOE initiative in response to the Soviet nuclear disaster at the Chernobyl power station near Kiev in the Ukraine in April, 1986. Before the Chernobyl reactor fire had been extinguished, Secretary Herrington invited six private U.S. citizens, each expert in certain aspects of nuclear physics, engineering, and systems management, to assist DOE in an expedited examination of the safety of its own plutonium production reactor, the N–Reactor, at the Hanford Reservation near Richland, Washington.[2] Like the one at Chernobyl, and apparently unlike any other in the United States, the N–Reactor, built in 1963, moderates the fission reaction of its fuel elements with graphite and cools the reactor core with water.

In a May 5th press release DOE announced that it had "established a special safety review panel" of experts to study the N–Reactor; two days later a DOE Assistant Secretary testified before a Congressional committee that Secretary Herrington had formed an "external panel of independent experts ... to conduct an analysis and review of the issues raised by the Soviet incident...." DOE then scheduled what it termed "joint briefings" for the experts in Washington, D.C., for May

22nd and 23rd on, principally, general aspects of the Chernobyl incident. Further "joint briefings" are to be given on June 12–13 on the N–Reactor specifically, and a tour of the N–Reactor during shut-down will be conducted on July 1–2. A final "joint briefing," if necessary, will take place in mid-July.

On May 16th NRDC learned of the first "joint briefing" session to occur the following week and, insisting that the "N–Reactor panel" was covered by FACA, asked to be allowed to send observers. On May 19th DOE refused, prompting the filing of this action on May 20, 1986.[3]

### II.

The sole issue raised by defendants' motion for summary judgment is whether or not its ensemble of experts constitutes an "advisory committee" within the meaning of FACA.[4] Section 3 of the Act provides,

[t]he term "advisory committee" means any committee, board, commission, council, conference, panel, task force, or other similar group ... which is ... established or utilized by one or more agencies, in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government....

5 U.S.C. App. II § 3(2)(C).

Read literally, that definition would seem to apply to virtually any convocation of two or more persons from whom any federal

---

**2.** In a letter dated May 2, 1986, to two of the experts—the others were contacted orally—Secretary Herrington declared that he had "decided to invite an *ad hoc* group of experts ... to assist the Department" in "examin[ing] all of the key technical questions and prob[ing] into all the potential safety issues raised by the Soviet incident" as it related to the N–Reactor. "While members of the group will be free to consult with one another in any way they choose," he continued, "it is the individual expertise and ... advice, from each member, that the Department is seeking. The information and findings developed from the Department's safety reviews of the N–Reactor will, of course, be made available to each member of the group."

The invitees are all pre-eminent academicians or consulting engineers, with many years' technical and executive experience in nuclear power

generation. None appears from the record to have any present direct connection with the commercial nuclear power industry. All, moreover, have the requisite security clearances.

**3.** On May 21st the Court denied NRDC's application for a temporary restraining order to preclude the "briefing" scheduled for the next day, at which, according to DOE, five of the six experts able to attend were to be given information—some of it classified—known to the Department about the Chernobyl incident.

**4.** Section 10 of FACA provides that all advisory committee meetings be open to the public, except where considerations of national security dictate otherwise, and imposes numerous other requirements on the conduct of its business. 5 U.S.C.App. II § 10.

official desired information. *See Nader v. Baroody*, 396 F.Supp. 1231, 1232 (D.D.C. 1975), *vacated as moot*, No. 75–1969 (D.C. Cir. Jan. 10, 1977). Although cognizant that such a reading, if it were to import that any curious bystander who wanted to do so be privy to it, would effectively stifle much of the daily intercourse between the government and the rest of the nation, NRDC adverts to certain portions of the legislative history which suggest that Congress nevertheless fully intended as expansive an interpretation as possible be given the definition of "advisory committee," consistent with common sense, to protect federal decision-makers from nefarious influences. *See* S.Rep. No. 1098, 92d Cong., 2d Sess. 6 (1972). The Senate Report, for example, in explaining its version of the bill,[5] stated:

> The intention is to interpret the words "established" and "organized" in their most liberal sense, so that when an officer brings together a group by formal or informal means, by contract or other arrangement, and whether or not Federal money is expended, to obtain advice and information, such group is covered by the provisions of this bill.

S.Rep. No. 1098, 92d Cong., 2d Sess. 8 (1972).

NRDC implies that Secretary Herrington proceeded as he did, by way of an informal letter of invitation rather than, with authorization in advance from the President, giving formal notice in the Federal Register of an intent to appoint (as would be required by 5 U.S.C. App. II § 9(a) in the case of a true "advisory committee"), to avoid being bound by the Act and its public access provisions. But there is absolutely no evidence that the Secretary's failure to comply with the Act's requirements was employed as a subterfuge. *See Nader v. Baroody*, 396 F.Supp. at 1234. *Cf. Food Chemical News, Inc. v. Davis*, 378 F.Supp. 1048, 1051 (D.D.C.1974). It appears, rather, that the Secretary had no thought he might be ap-

pointing an "advisory committee" at all. He simply wanted the best advice available, public or private, as quickly as possible to avert a repetition of Chernobyl in the United States where conditions seemed most likely to predispose.

NRDC then calls attention to a number of attributes of the "N–Reactor panel" which are characteristic of the sort of formal consultative assembly Congress intended should be opened to the public. Not only does DOE itself speak of its creation as a "panel" which it acknowledges it has "established," the "panel" has a "structure" (i.e., a chair and vice-chair), a "charter" (i.e., the Secretary's letter), and a "staff" (i.e., a DOE official assigned by the Secretary to "support" the experts in their work).

DOE asserts that "[a] joint report will neither be sought nor accepted" from the experts, and cites a General Services Administration regulation which states that FACA is inapplicable to "[a]ny meeting initiated by a Federal official(s) with more than one individual for the purpose of obtaining the advice of individual attendees and not for the purpose of utilizing the group to obtain consensus advice or recommendations." 41 C.F.R. 101–6.1004(j) (1985). The N–Reactor experts are, it says, merely "individual consultants simultaneously retained." As authority for what the Secretary has done, however, the regulation begs the question, for it would provide no sanctuary for the experts' common endeavors outside public view if the statute itself does not permit it.

As a practical matter, DOE says, the appearance of a formal collegial existence for the body is illusory. The "chair" and "vice chair" appointments are merely administrative. No one will be presiding over evidentiary or deliberative proceedings; indeed, there will be none. The experts will work independently and report alone. The "charter" is simply the Secretary's letter explaining why and about what he is ask-

---

**5.** The Senate bill differed, for present purposes, only in its use of the words "established or organized" rather than the "established-or-utilized" formula appearing in the statute as enacted.

ing advice. The "staff"—of one—will function primarily as liaison. The "meetings" (or "joint briefings") will be occasions on which knowledge will be imparted by the government to the experts, not the other way around. Above all, no policy is to be made, save by the Secretary after he has been fully informed about the N–Reactor from sources both within and without the Department.

It serves no purpose here, however, to attempt to distinguish between "advisory committees" subject to the Act and other conclaves for the edification of government officials on the basis of some relative quantum of indicia of formality. It is apparent that the purpose of FACA was to suppress an evil which does not lurk in the circumstances of this particular case. Congress' concern, when it enacted FACA, was with a pernicious species of so-called "advisory" bodies: those dominated by industry leaders and the like with substantial parochial interest in the outcome of the matter under discussion, usually some onerous regulatory or policy proposal. The House Report warns that,

> [o]ne of the great dangers in the unregulated use of advisory committees is that special interest groups may use their membership on such bodies to promote their private concerns. Testimony received at hearings before the Legal and Monetary Affairs Subcommittee pointed out the danger of allowing special interest groups to exercise undue influence upon the Government through the dominance of advisory committees which deal with matters in which they have vested interests.

H.R.Rep. No. 1017, 92d Cong., 2d Sess. 6 (1972), U.S.Code Cong. & Admin.News 1972, pp. 3491, 3496. A Senate staff report submitted for the record by Senator Percy states that,

> [v]iewed in its worst light, the federal advisory committee can be a convenient nesting place for special interests seeking to change and preserve a federal policy for their own ends. Such committees stacked with giants in their respective fields can overwhelm a federal decision maker, or at least make him wary of upsetting the status quo.

118 Cong. Rec. 30,276 (1972). *See* 118 Cong. Rec. 16,299 (1972) (remarks of Rep. Fascell); 118 Cong. Rec. 30,272 (1972) (remarks of Sen. Metcalf); 118 Cong. Rec. 30,280 (1972) (remarks of Sen. Roth). *See also Consumers Union v. HEW*, 409 F.Supp. 473, 475 (D.D.C.1976), *aff'd*, 551 F.2d 466 (D.C.Cir.1977).[6]

■ That concern is simply not implicated in the instant case. There is no evidence whatsoever of any selfish advantage to be gained on the part of any of the men chosen by the Secretary to advise him, and none appears from the record to have anything at hazard in the situation. They have not been asked to comment upon nuclear power generally, or the manner of its regulation, but merely to examine, from their several perspectives of technical expertise, whether or not the government ought to allow a single reactor of its own to continue in operation in the immediate future and, if so, under what conditions.

The Court concludes that the six individuals who have been asked for their advice,

---

**6.** The cases cited by the NRDC in which FACA was held to apply all involved industry "advisors" presumably attempting to ameliorate the impact of what they perceived as excessive or inadequate government regulation. *See, e.g., National Nutritional Foods Ass'n v. Califano*, 603 F.2d 327 (2nd Cir.1979) (meeting between Food and Drug Administration officials and physicians regarding extent to which use of dietary supplements for weight loss required medical supervision); *Natural Resources Defense Council, Inc., v. Edwards*, No. 81–944 (D.D.C. Sept. 8, 1981) (meeting of Energy Secretary with companies "interested" in nuclear energy to elicit in- dustry views on commericial nuclear fuel reprocessing capacity); *Food Chemical News*, 378 F.Supp. at 1051 (committee of liquor industry representatives whose advice on ingredient labeling of distilled spirits was sought by the Bureau of Alcohol, Tobacco and Firearms). *See also Center for Auto Safety v. Tiemann*, 414 F.Supp. 215, 225–26 (D.D.C.1976) (state highway officials represent the "regulated" in federal-aid-to-highways program and are, therefore, sufficiently similar to representatives of private interests to qualify them as an advisory committee under FACA).

however their affiliation is termed, are not an "advisory committee" within the meaning of the Act, and their labors may go forward as presently contemplated, and without plaintiff's being in attendance whenever they happen to be together.

### III.

In light of the Court's disposition of defendants' motion for summary judgment, it is unnecessary to reach the balance of NRDC's application for a preliminary injunction. But, for purposes of review on appeal, the Court finds that the NRDC has failed to show that it is entitled to injunctive relief in the other essential respects as well. *See Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 842–44 (D.C.Cir.1977); *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958).

In addition to its actual failure of success on the merits, it is unlikely that NRDC will remain for long in doubt as to what the experts will recommend, for their reports will, if not otherwise exempt, be available by way of a request under the Freedom of Information Act, 5 U.S.C. § 552. And, to the extent it wants to be sure that the Secretary acts only upon information which is "thorough and objective," and is fearful that the work of the experts will be neither, it is entitled to give him its own advice, with or without invitation, at any time. Its "injury," therefore, such as it is, is neither substantial nor irreparable, whereas the injury which could be done the Secretary, not to mention the rest of the country, by an indefinite delay of his inquiry while this case proceeds through the courts is too substantial and irreparable to contemplate.

For the foregoing reasons, therefore, it is, this ____ day of June, 1986,

ORDERED, that plaintiff's application for a preliminary injunction is denied; and it is

FURTHER ORDERED, that defendants' motion for summary judgment is granted,

and the complaint is dismissed with prejudice.