**WASHINGTON LEGAL FOUNDATION, Plaintiff,**

and

**Public Citizen, Plaintiff–Intervenor,**

v.

**UNITED STATES DEPARTMENT OF JUSTICE, Defendant.**

**Civ. A. No. 86–2883.**

United States District Court, District of Columbia.

Aug. 4, 1988.

Daniel J. Popeo, Paul D. Kamenar, Washington Legal Foundation, Washington, D.C., for plaintiff.

Elizabeth Pugh, Thomas Millet, Civil Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

Eric R. Glitzenstein, Alan B. Morrison, Patti Goldman, Public Citizen Litigation Group, Washington, D.C., for plaintiff–intervenor.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiff Washington Legal Foundation and plaintiff-intervenor Public Citizen[1] bring this action against the United States Department of Justice ("DOJ")[2] seeking

---

**1.** Plaintiff Washington Legal Foundation ("WLF") and plaintiff-intervenor Public Citizen will be referred to herein as "plaintiffs," except as otherwise noted.

**2.** Plaintiff WLF's earlier action brought against only the American Bar Association Standing Committee on Federal Judiciary and its individual members, *Washington Legal Found. v. American Bar Ass'n Standing Comm. on Federal Judiciary,* 648 F.Supp. 1353, 1359 (D.D.C.1986)

declaratory relief that the agency's use of the American Bar Association Standing Committee on Federal Judiciary ("ABA Committee" or "Committee") for evaluations of the qualifications of nominees for federal judgeships violates the Federal Advisory Committee Act ("FACA" or "Act"), 5 U.S.C. App. II.[3] Plaintiffs request that, should DOJ continue to solicit advice from the ABA Committee, the agency be enjoined to comply with the Act's requirements,[4] such as filing an advisory committee charter, 5 U.S.C. App. II, § 9(c), providing advance public notice of Committee meetings, id. § 10(a)(2), opening meetings to the public, id. § 10(a)(1), assigning a federal official to attend all meetings, id. § 10(e), maintaining and providing public access to the Committee's records, id. §§ 8(b), 10(b), and having a "fairly balanced" membership in terms of points of view represented and functions to be performed.[5] The matter now comes before

("*WLF*"), was dismissed shortly after this second action was filed because "the proper defendant in a suit brought to enforce the [Federal Advisory Committee Act ("FACA")] is the government, not the advisory committee 'utilized' by the government." This Court emphasized in that Opinion, however, that it was not determining the merits of the issue now before the Court, *i.e.*, whether the ABA Committee is encompassed by FACA's definition of "advisory committee." *Id.* at 1359 n. 4.

3. Plaintiff WLF also requests in its complaint that this Court declare that DOJ's utilization of the ABA Committee violates the Administrative Procedures Act, 5 U.S.C. § 706, but this issue has nowhere been raised separately in the motions. It is, therefore, not addressed here.

4. In addition, WLF asks this Court to order DOJ to assemble and provide plaintiff information that WLF has requested in the past, such as names of potential nominees. *See* Complaint, ¶¶ 16, 17. WLF has not provided any support for its claim, and as retrospective relief, it is presumptively inappropriate under FACA. The proper remedy for violation of FACA is a prospective injunction, *i.e.*, an order requiring the government either to cease its undertakings with the advisory committee or to ensure that the advisory committee is brought into compliance with the Act. *WLF*, 648 F.Supp. at 1360; *see also Food Chemical News, Inc. v. Davis*, 378 F.Supp. 1048, 1049 (D.D.C.1974).

5. Although "balanced membership" is a requirement for committees "established" under FACA, it is unclear whether it also applies to groups such as the ABA Committee that are not established but only "utilized" within the meaning of Section 3(2). *See* discussion *infra* Section II(A). Perhaps out of an abundance of caution, defendant has conditionally addressed the issue, noting that this provision "arguably applies." After examining plaintiffs' complaints, the statute, and the regulations promulgated thereunder, however, the Court concludes that, even were FACA found applicable, balanced committee membership may not necessarily be required.

The balanced membership requirement is contained in the section of FACA that applies only to committees "established" by agencies or the President. 5 U.S.C.App. II, § 5(b)(2), (c). The regulations promulgated by the General Services Administration ("GSA") on balanced membership do not make clear whether GSA believes that these provisions would also apply to "utilized" committees. 41 C.F.R. § 101–6.1002. Although the requirement has been held to apply to committees established by the President, as well as by legislation, *National Anti–Hunger Coalition v. Executive Committee of President's Private Sector Survey on Cost Control*, 711 F.2d 1071, 1073 n. 1 (D.C.Cir.1983), no court has expressly addressed the issue of whether it applies to groups only "utilized" but not "established" under FACA. *See National Nutritional Foods Ass'n v. Califano*, 603 F.2d 327, 336 (2d Cir.1979); *see also Center for Auto Safety v. Cox*, 580 F.2d 689, 693–94 (D.C.Cir. 1978). That plaintiffs have not pressed the issue in this case may reflect the uncertainty of the sparse law in this area.

In the earlier case, plaintiff WLF vigorously contended that FACA requires the ABA Committee to have a fairly balanced membership. Complaint, Civil Action No. 85–3918, ¶ 1. WLF argued that the Committee's investigations "have been conducted ... in such a way as to penalize or discredit candidates who hold or profess conservative principles or ideology, and to delay or present their nomination by the President." Complaint, *id.*, ¶ 26. WLF also asserted that the ABA Committee consulted on a regular basis with "liberal" and "left-wing" political organizations to the exclusion of conservative organizations. *Id.* ¶ 25. (Notably, the ABA Committee's practice of consulting with the Judicial Selection Project, which sought to represent minority and women's groups interested in the selection process, was discontinued in 1985 because the Committee determined that the practice was "inconsistent with its concerns for confidentiality and obligations to the President." *Id.* at Exhibit F.) The ABA Committee has indeed been criticized for being "too conservative," but also for being "too liberal." Answer, Civil Action No. 85–3918, ¶ 25.

No such allegations of political imbalance are raised by WLF in this case. Indeed, WLF now states that "the balanced membership requirement of Section 5 of FACA ... is not an issue in

the Court on the parties' motions for summary judgment.[6]

The primary questions presented by this case are two-fold: (1) is the ABA Committee an advisory committee under FACA? and (2) would application of FACA to the ABA Committee violate the constitutional principle of separation of powers? For the reasons set forth below, the Court finds that the ABA Committee is an advisory committee "utilized" by DOJ within the meaning of FACA, 5 U.S.C. App. II, § 3(2), but that FACA cannot constitutionally be applied to the ABA Committee because to do so would violate the express separation of nomination and consent powers set forth in Article II of the Constitution and because no overriding congressional interest in applying FACA to the ABA Committee has been demonstrated.

## I. Factual Background

In selecting individuals to nominate for federal judgeships, the President considers numerous sources of information and advice, including that of private citizens, public officials, and government agencies.[7] At

issue in this case is the information provided to the President by the fourteen-member ABA Standing Committee on Federal Judiciary,[8] one of the several working committees of the 328,000–member American Bar Association and a private entity not financially supported by any federal agency.[9] The ABA Committee submits its evaluation and rating of nominees to the Attorney General, who in conjunction with the President's federal judicial selection committee,[10] gathers information and makes recommendations to the President concerning the qualifications of individuals who may be considered for nomination and appointment.[11]

At the direction of the President's federal judicial selection committee, DOJ commences the review process by requesting the ABA Committee to investigate and evaluate potential candidates' professional qualifications and to provide a formal report to the Assistant Attorney General.[12] DOJ does not provide the names of potential nominees to any other non-governmental entities for evaluation.[13] DOJ notifies candidates of their selection for possible

---

this case." WLF's Opposition to Defendant's Motion to Dismiss ("WLF Opp.") at 22; *see also* *id.* at 35 ("plaintiff makes no challenge as to the President's selection or choice of members on the committee"). Accordingly, for these reasons, and because of the final ruling in this case, the Court declines to comment further on this issue.

6. Defendant originally filed a motion to dismiss, but then suggested that its motion should be converted, for the Court's convenience, to a motion for summary judgment in light of Public Citizen's motion for summary judgment. Defendant's Opposition to Plaintiff–Intervenor's Motion for Summary Judgment and Reply to Plaintiffs' Opposition to Defendant's Motion to Dismiss ("Def.Opp.") at 6 n. 3. All the parties have since filed statements of material facts, and plaintiff WLF has filed an "alternative" motion for summary judgment. Accordingly, the Court shall treat the issues presented in accordance with the standards for summary judgment. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

7. Declaration of Steve A. Mathews, Deputy Assistant Attorney General, Office of Legal Counsel, United States Department of Justice ("Mathews Decl."), ¶ 2.

8. American Bar Association, *Standing Committee on Federal Judiciary: What It Is and How It Works* ("ABA, *Standing Committee*") at 1.

9. *WLF,* 648 F.Supp. at 1354; Mathews Decl. ¶ 5; Answer, Civil Action 85–3918, ¶ 19.

10. The President's federal judicial selection committee is comprised of immediate advisors to the President, including the: Counsel, Deputy Counsel, and Associate Counsel to the President; the Assistant to the President for Political and Intergovernmental Affairs; the Assistant to the President for Legislative Affairs; the Director of Presidential Personnel; the Attorney General; Deputy Attorney General; Counselor to the Attorney General; and the Assistant Attorney General and Deputy Assistant Attorney General, Office of Legal Policy. Mathews Decl. ¶ 7.

11. *Id.* ¶ 3.

12. *Id.* ¶ 8.

13. WLF's Statement of Material Facts, ¶¶ 2, 3; Public Citizen's Statement of Material Facts, ¶¶ 2, 3; Defendant's Response to WLF's Statement of Material Facts, ¶¶ 2, 3.

nomination, requests candidates to complete a Personal Data Questionnaire designed by the ABA,[14] and directs them to provide the information requested on that questionnaire to the Chair of the ABA Committee, to the Committee's representative for the relevant federal circuit, and to the Assistant Attorney General, Office of Legal Policy.[15] The Committee's review process has

> traditionally involved confidential interviews with lawyers, judges, and professors in the nominee's community, close scrutiny of the nominee's legal writings, and talks between Committee members and the nominee over the nominee's qualifications. All details of the review process and the identity of those asked to discuss a nominee's qualifications are kept confidential by the ABA.[16]

Upon completion of the investigation, a report is prepared and circulated to the full ABA Committee, which then together determines a final qualifications rating—either "exceptionally well qualified," "well qualified," "qualified," or "not qualified." [17] This one- or two-sentence rating [18] is forwarded to DOJ, accompanied by an indication of whether it is supported by a majority or substantial majority of the Committee, or unanimously.[19] The rating and the report remain confidential.[20]

The Committee's rating, along with other information such as the Federal Bureau of Investigation reports, the candidate's finan-

cial declaration, and medical background, is then considered by the Attorney General in making a recommendation to the President.[21]

After the President announces the nomination, the ABA Committee rating is publicly disclosed during the confirmation hearings conducted by the Senate Judiciary Committee.[22]

## II. Discussion

### A. Is the ABA Committee an Advisory Committee under FACA?

In determining whether the ABA Standing Committee on Federal Judiciary is an advisory committee under FACA, the Court first turns to the plain language of the statute. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *Kosak v. United States,* 465 U.S. 848, 853, 104 S.Ct. 1519, 1523, 79 L.Ed.2d 860 (1984). FACA defines an "advisory committee" as

> any committee, board, commission, council, conference, panel, task force, or other similar group ... which is ...
>
> (B) established or *utilized* by the President, or
>
> (C) established or *utilized* by one or more agencies,
>
> in the interest of obtaining advice or recommendations for the President or

---

**14.** Defendant's Response to WLF's Statement of Material Facts, ¶ 4.

**15.** Mathews Decl. ¶ 8.

**16.** *WLF,* 648 F.Supp. at 1355.

**17.** *Id.*

**18.** Answer, Civil Action No. 85–3918, ¶ 33.

**19.** Mathews Decl. ¶ 10.

**20.** *WLF,* 648 F.Supp. at 1355. The reasons for the ABA Committee's rating of a potential nominee are, however, "sometimes" revealed to DOJ, and after the individual is nominated, are "sometimes" revealed to the Senate Judiciary Committee. Defendant's Response to WLF's Statement of Material Facts, ¶ 9. But, the identities of the ABA Committee's sources and its internal reports remain confidential. *Id.*

The prospective nominee's name, of course, does not often remain a secret from the public. In the course of the ABA Committee's extensive investigation and consultation with hundreds of individuals and several organizations, public identification of the prospective nominee is "inevitable." ABA, *Standing Committee,* at 9. The ABA Committee observes, however, that such public knowledge "may be beneficial in some circumstances in that it encourages investigation into the background and personal history of the prospective nominees by other persons." *Id.*

**21.** Mathews Decl. ¶¶ 4, 11; Defendant's Response to WLF's Statement of Material Facts, ¶ 6; WLF's Statement of Material Facts, ¶ 6; ABA, *Standing Committee,* at 7.

**22.** *See* Defendant's Response to Plaintiffs' Statement of Material Facts, ¶ 8.

one or more agencies or officers of the federal government....

5 U.S.C. App. II, § 3(2) (emphasis added). Since there is no contention here that the ABA Committee was "established" by the President or a federal agency, the Court proceeds to examine whether DOJ has "utilized" the ABA Committee within the meaning of Section 3(2).

Interpreting the term "utilized" is not as complicated a task as defendant suggests. The common-sense meaning of "utilized" is "to make use of." *Webster's Third New International Dictionary* (1963). The facts as outlined above and discussed further below easily support the conclusion that DOJ "makes use of" the ABA Committee by directly and preferentially soliciting its assistance and recommendation on judicial nominees. Although reliance on the plain language of FACA alone is not entirely satisfactory because FACA "contains a very broad, imprecise definition, and in this respect is not a model of draftsmanship," *Nader v. Baroody,* 396 F.Supp. 1231, 1232 (D.D.C.1975); *see also Center for Auto Safety v. Tiemann,* 414 F.Supp. 215, 223 (D.D.C.1976), *remanded on other grounds,* 580 F.2d 689 (D.C.Cir.1978), the statute's legislative history, while not greatly illuminating, *Consumers Union of the United States, Inc. v. Department of Health, Education, and Welfare,* 409 F.Supp. 473, 475 (D.D.C.1976), *aff'd,* 551 F.2d 466 (D.C.Cir.1977), also supports a liberal interpretation of the term "utilized." *Lombardo v. Handler,* 397 F.Supp. 792, 797–800 (D.C.Cir.1975), *aff'd,* 546 F.2d 1043 (D.C.Cir.1976), *cert. denied,* 431 U.S. 932, 97 S.Ct. 2639, 53 L.Ed.2d 248 (1977); *Center for Auto Safety,* 414 F.Supp. at 223 (citing S.Rep. No. 92–1098, 92d Cong., 2d Sess. 8 (1972) ("the words 'established' and 'organized' should be interpreted in their most liberal sense' ") and H.R.Rep. No. 92–1017, 92d Cong., 2d Sess. 4 (1972) ).

The regulations promulgated under FACA by the General Services Administration ("GSA"), 5 U.S.C. App. II, § 7(c), further support the conclusion that DOJ has "utilized" the ABA Committee as an advisory committee. According to GSA, a committee "utilized" under FACA is

a committee or other group composed in whole or in part of other than full-time officers or employees of the Federal Government with an established existence outside the Federal Government which the President or agency official(s) adopts, such as through institutional arrangements, as a preferred source from which to obtain advice or recommendations on a specific issue or policy within the scope of his or her responsibilities in the same manner as that individual would obtain advice or recommendations from an established advisory committee.

41 C.F.R. § 101–6.1003 (emphasis added). The ABA Committee fits squarely within this definition. The Committee's historically lengthy, direct, and significant relationship with DOJ in the evaluation process has clearly made it a preferred source of advice in the nomination process. While, as defendant suggests, no evidence in the legislative history of FACA has surfaced to show that Congress intended that the Act would apply specifically to the ABA Committee,[23] the undisputed facts regarding DOJ's relationship with the ABA Committee readily support the conclusion that the Committee falls with Congress' definition of advisory committee.

Since 1952, DOJ has directly solicited from the ABA Committee its evaluation of and recommendation on federal judicial nominees. Defendant concedes that the ABA Committee is "one historically uti-

---

**23.** Defendant suggests that through the several years in which Congress has received advice from the ABA Committee, "[t]here has not been any indication whatsoever that it intended the FACA to apply to the Committee." Def.Opp. at 15. Defendant's citations to discussions in the Congressional Record, however, simply do not address this issue, *see* 132 Cong.Rec. S8562–83 (daily ed. June 26, 1986) (remarks of Sen. Thurmond), 132 Cong.Rec. S8476–78 (daily ed. June 25, 1986) (remarks of Sen. Hatch) (discussing nomination of Daniel A. Manion to the Seventh Circuit Court of Appeals), and notably defendant has not pointed to any indication that Congress intended *to exempt* the ABA Committee from FACA. As Public Citizen points out, it is not surprising that only a few such advisory committees are mentioned in the legislative history of FACA as over 2600 formal interagency and advisory committees existed at the time FACA was enacted. Public Citizen's Motion for Summary Judgment, at 7 n. 1.

lized, important source of advice in this area" and its "evaluations of candidates are an integral and important part of the nomination process." [24] The relationship between DOJ and the ABA Committee is mutual, direct, and to a large extent exclusive.[25] Nominees are directed by DOJ to submit personal information on an ABA–designed questionnaire directly to the ABA Committee. Further, the ABA Committee is the only non-governmental entity routinely provided the names of potential nominees by DOJ in advance of public announcement.[26] And, in return, the ABA provides its recommendation and report confidentially only to the DOJ and, only later, publicly to the Senate. DOJ highly values the ABA Committee's evaluation and rating, even though DOJ and the President do not always agree with the ABA Committee's assessment of the nominee's qualifications.[27] Moreover, the ABA Committee is a formal committee, with a clearly defined structure, singular purpose, and apparently only two "clients"—the Attorney General and the Senate Judiciary Committee.[28] The ABA Committee is not merely a group of casually associated individuals who are consulted singly;[29] it self-consciously and purposefully acts "as a committee."[30] The ABA Committee is thus a traditionally, routinely, and preferentially utilized source of advice for DOJ and the President[31] on potential nominees for federal judgeships.

■ Defendant argues, nonetheless, that this Court should not interpret FACA to apply to the ABA Committee because to do so would be incongruous with congressional intent. According to DOJ, "the fundamental purpose of FACA was to control private special interests' groups excessive influence over federal agencies with regulatory authority or control over matters of direct concern to those groups,"[32] and since the ABA Committee is not a special interest group, it should not be subject to FACA. This argument is unpersuasive. Though Congress may have been particularly motivated to shine the public light on

**24.** *See* Def.Opp. at 1; *id.* at 30 n. 27.

**25.** *See National Nutritional Foods v. Califano,* 603 F.2d 327, 336 n. 10 (2d Cir.1979).

**26.** *See Center for Auto Safety v. Cox,* 580 F.2d 689, 694 (D.C.Cir.1978) (agency disclosed proposed regulations to select groups).

**27.** The weight given to a group's recommendation is one factor to be considered in determining whether the group is utilized within the meaning of Section 3(2). *National Nutritional Foods,* 603 F.2d at 336 ("One factor weighing heavily with us is that the Commissioner leaned so strongly on the advisory group in his press release and, even more so, in his proposed regulation.")

**28.** *See Nader v. Baroody,* 396 F.Supp. 1231, 1233 (D.D.C.1975).

**29.** *Cf. Natural Resources Defense Council, Inc. v. Herrington,* 637 F.Supp. 116, 119 (D.D.C.1986) (held six-member panel of private experts who were to work independently and alone were not subject to FACA).

**30.** *See Nomination of Robert H. Bork to be Associate Justice of the Supreme Court of the United States, Hearings Before the Committee on the Judiciary of the United States Senate,* 100th Cong., 1st Sess. 938 (1987) ("*Bork Hearings*") (remarks of Judge Harold R. Tyler, Jr., Chair, ABA Committee); *Transcript of Proceedings,*

*Nomination of Anthony M. Kennedy to be an Associate Justice of the Supreme Court, Hearings Before the Committee on the Judiciary of the United States Senate* 28 (Dec. 16, 1987) ("*Kennedy Hearings*") (remarks of Judge Tyler).

**31.** That the Attorney General acts as an intermediary between the ABA Committee and the President does not significantly alter the constitutional analysis. The nomination prerogative is clearly committed to the President and not the agency under the Constitution. The President has partially delegated this responsibility to amass, collate, and analyze information from various sources and in consultation with others (including the President) to DOJ. Notably, the President's federal judicial selection committee is composed of *both* DOJ officials and members of the President's staff. *See supra* note 10. In the end, of course, it is the President, vested by the Constitution with the power of appointment, who makes the nomination.

**32.** Def.Opp. at 13. In response, WLF asserts that the ABA is "nothing more than a special interest group which, on behalf of less than half the lawyers in America, lobbies for its point of view before the Congress, the agencies, and courts of law," WLF Opp., at 14, but fails to allege that the ABA Committee should be considered a special interest group with respect to the process for nominating federal judges. The record indicates that such an argument would, indeed, be difficult to prove.

agency relationships with special interest or regulated groups, defendant has not demonstrated that the legislative history, language of the statute, the regulations, or caselaw support such a distinction in the application of FACA. To the contrary, these sources reveal that Congress' purpose was much broader.

Enacted by Congress in 1972, FACA expressly recognizes that advisory bodies "in the executive branch of the Federal Government ... are frequently a useful and beneficial means of furnishing expert advice, ideas, and diverse opinions." 5 U.S.C. App. II § 2(a); *see also* S.Rep. No. 1098, 92d Cong., 2d Sess. 1 (1972), H.R.Rep. No. 92–1017, 92d Cong., 2d Sess. 1 (1972) (both reports setting forth purpose of FACA and emphasizing public access to agency decisionmaking process without mentioning special interest groups).[33] The central purpose of FACA is quite general: "to control the advisory committee process and to open to public scrutiny the manner in which government agencies obtain advice from private individuals and groups." *Washington Legal Foundation v. American Bar Ass'n*, 648 F.Supp. 1353, 1358 (D.D.C.1986) ("*WLF*") (quoting *HLI Lordship Indus., Inc. v. Committee for Purchase From the Blind*, 615 F.Supp. 970, 978 (E.D.Va.1985), *reversed on other grounds*, 791 F.2d 1136 (4th Cir.1986) ); *see also Food Chemical News, Inc. v. Davis*, 378 F.Supp. 1048, 1051 (D.D.C.1974).

FACA itself mentions few exemptions based on the nature of the organization giving the advice. The statute specifically excludes from its coverage only groups established or utilized by the Central Intelligence Agency, the Federal Reserve System, and "any *local* civic groups whose primary function is that of rendering a public service with respect to a Federal program." 5 U.S.C. App. II, § 4(c) (emphasis added).

GSA's regulatory interpretation of FACA confirms that groups like the ABA Committee were not intended to be excluded from FACA. The GSA regulations set forth several specific examples of types of advisory committees exempt from the Act, 41 C.F.R. § 101–6.1004, none of which apply to the ABA Committee. Indeed, several mention by implication certain characteristics of the ABA Committee that bring it within the Act's purview.[34]

While the courts have considered a group's self-interest in the agency's decision a factor supporting application of FACA, *see, e.g., Center for Auto Safety*, 414 F.Supp. at 225 (association of state highway and transportation officials); *Food Chemical News*, 378 F.Supp. at 1051–52 (consumer and distilled spirits industry representatives), none have held that an advisory group's civic, benign, or neutral motives place it beyond the statute's reach. *See Natural Resources Defense Council, Inc. v. Herrington*, 637 F.Supp. 116, 120 (D.D.C.1986) (emphasizing that advisory panel was not composed of special interest representatives but deciding case on grounds that panel was to provide advice individually and not as a committee); *see also National Nutritional Foods Ass'n v. Califano*, 603 F.2d 327, 334–36 (2d Cir. 1979) (leading experts on obesity control). Thus, regardless of whether the ABA Committee is considered a "special interest" group, it is under FACA's definition of advisory committee.

---

**33.** *See* H.R.Rep. No. 92–1016, 92d Cong., 2d Sess. 6 (1972) ("*One* of the great dangers of unregulated use of advisory committees is that special interest groups may use their memberships on such bodies to promote their private concerns.") (emphasis added).

**34.** *See, e.g.,* 41 C.F.R. § 101–6.1004(f) (exempting "local" civic groups rendering a public service; implying that national or federal groups of such nature are not exempt); *id.* § 101–6.1004(h)(2) (exempting meetings initiated by a group for the purpose of expressing that group's view, provided that the group is not used as a "preferred source of advice or recommendation"; implying that where agency initiates contact, and group is a preferred source, the group falls within FACA); *id.* § 101–6.1004(i) (exempting committees with primarily "operational" as opposed to "advisory" function; implying that committee like ABA Committee, whose primary function is advisory, is covered by FACA); and *id.* § 101–6.1004(j) (exempting meetings for purpose of obtaining advice of individual attendees and not for purpose of obtaining group consensus; implying that advice provided expressly by a committee such as the ABA Committee is under FACA).

Although cognizant of its duty to "first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question may be avoided," *WLF*, 648 F.Supp. at 1357 (quoting *International Ass'n of Machinists v. Street*, 367 U.S. 740, 749–50, 81 S.Ct. 1784, 1789–90, 6 L.Ed.2d 1141 (1961) ), a court "cannot press statutory construction 'to the point of disingenuous evasion' even to avoid a constitutional question." *United States v. Locke*, 471 U.S. 84, 96, 105 S.Ct. 1785, 1793, 85 L.Ed.2d 64 (1985) (quoting *George Moore Ice Cream Co. v. Rose*, 289 U.S. 373, 379, 53 S.Ct. 620, 622, 77 L.Ed. 1265 (1933) (Cardozo, J.) ); *see also Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 3255, 92 L.Ed.2d 675 (1986). In this case, the Court finds that the plain language of FACA, its legislative history, its purpose, and GSA's interpretation of the Act all support the conclusion that the ABA Committee falls within FACA's definition of advisory committee. The constitutional issue here cannot fairly be avoided.

*B. Does Application of FACA to the ABA Committee Violate the Constitutional Principle of Separation of Powers?*

█ The very breadth of the language in FACA that compels the conclusion that the ABA Committee is subject to that Act concomitantly opens this application to constitutional question.[35] As this Court noted in *WLF*, the ABA Committee "raised serious questions about the constitutionality of the plaintiff's proposed application of FACA." [36] It is important to focus on the specific constitutional prerogative that defendant contends will be trampled were FACA to be invoked—the President's power of appointment.

Article II, § 2, cl. 2, of the Constitution provides that

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint ... Judges of the Supreme Court and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law.

The President's constitutionally assigned role is thus to nominate federal judges, and the function of the Senate is to provide advice and consent. While the Court does not adopt defendant's view that general principles of separation of powers preclude the application of FACA to the nomination process,[37] the Court is nonetheless persuaded for reasons explained below that Congress cannot impose FACA in this case because of the specific limitations on the

---

**35.** *See National Anti–Hunger Coalition v. Executive Committee of President's Private Sector Survey on Cost Control*, 557 F.Supp. 524, 530 (D.D. C.1983), *aff'd*, 711 F.2d 1071 (1983) (the language of FACA is "obscure, imprecise, and open to interpretations so broad that in the present context at least it would threaten to impinge unduly on prerogatives preserved by the separation of powers doctrine").

**36.** *WLF*, 648 F.Supp. at 1356.

**37.** Defendant argues at length that Congress can almost never interfere with the affairs of the Executive because the three branches of government must be kept entirely separate. This argument goes too far and has, not surprisingly, been rejected by the courts.

As the Supreme Court made clear in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), although the Framers intended "that the powers of the three great branches of the National Government be largely separate from one another ... it is also clear from the provisions of the Constitution itself, and from the Federal-

ist Papers, that the Constitution by no means contemplates total separation of these three essential branches of Government." *Id.* at 120–21, 96 S.Ct. at 683. The Supreme Court has, indeed, "squarely rejected the argument that the Constitution contemplates a complete division of authority between the three branches." *Nixon v. Administrator, General Services*, 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977). Rather, the Court has embraced the view expressed in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635, 72 S.Ct. 863, 870, 96 L.Ed. 1153 (1952) (Jackson, J., concurring), that "the Framers of the Constitution sought to provide a comprehensive system, but the separate powers were not intended to operate with absolute independence." *United States v. Nixon*, 418 U.S. 683, 707, 94 S.Ct. 3090, 3107, 41 L.Ed.2d 1039 (1974). The notion forwarded by DOJ that separation of powers requires "three airtight departments" of government is indeed "archaic." *Nixon*, 433 U.S. at 443, 97 S.Ct. at 2790. *See also Common Cause v. Nuclear Regulatory Comm'n*, 674 F.2d 921, 935 (D.C.Cir.1982) (rejecting agency's contention that separation of

role of the legislature as expressed in Article II and because no overriding congressional interest has been demonstrated that outweighs FACA's intrusion on the nomination power of the President.

### 1. The Role of Congress in the Nomination and Appointment Process

In the *Federalist Papers*, No. 76, Alexander Hamilton articulated the argument for separating the roles of the President and the Senate in the nomination and appointment of federal judges:

> The sole and undivided responsibility of one man will naturally beget a livelier sense of duty and a more exact regard to reputation. He will, on this account, feel himself under stronger obligations, and more interested to investigate with care the qualities requisite to the stations to be filled....
>
> ....
>
> In the act of nomination, his judgment alone would be exercised; and as it would be his sole duty to point out the man who, with the approbation of the Senate, should fill an office, his responsibility would be as complete as if he were to make the final appointment.
>
> ....
>
> To what purpose, then, require the co-operation of the Senate? I answer that the necessity of their concurrence would have a powerful, though, in general, a silent operation. It would be an excellent check upon a spirit of favoritism in the President, and tend greatly to prevent the appointment of unfit characters from State prejudice, from family con-

nections, from personal attachment, or from a view to popularity.

*Id.* at 506–09.[38] This specific fundamental distinction between the branches in the nomination process has not since been eroded or blurred.[39]

This exclusiveness of the President's prerogative in this area is democratically tolerable (even, according to Hamilton, desirable or necessary) because of the checking function performed by the Senate. As former Senator Charles McC. Mathias, Jr. has commented: "Only with vigorous review can the Senate carry out the role envisioned for it by the framers of the Constitution—to provide a 'salutary restraint' upon executive power...."[40] Through the confirmation process, the public, individuals, and interested organizations alike have an opportunity to inform the decisionmaking process and scrutinize the President's nominee.

The ABA Committee has played an important role in the Senate confirmation process.[41] Like DOJ, the Senate Judiciary Committee has, since 1948,[42] directly solicited and highly valued the advice of the ABA Committee in considering nominees for federal judgeships. At the request of the Senate Judiciary Committee, a spokesperson for the ABA Committee appears at the hearings and reports on the reasons underlying the rating it has given to the nominee.[43] The ABA Committee may also submit a follow-up report to the Senate if new information develops that "warrants comment or evaluation."[44] Recent hearings on nominees for the Supreme Court confirm that the Senate Judiciary Committee highly respects and values the advice of

---

powers principles prevent imposition of Sunshine Act on commission meetings).

**38.** *See also* IX *Works of John Adams* 634 (1854 ed.) (the President "ought to select the [candidates] best qualified and most meritorious for offices ... without being shackled by any check by law, constitution or institution. Without this unrestrained liberty, he is not a check upon the legislative power nor either branch of it.").

**39.** *See, e.g.,* Omnibus Judgeships Act of 1978, P.L. 95–486, 92 Stat. 1629, 1633 (1978) (providing that no judicial nomination may be invalidated if the President fails to select a candidate

based on nonbinding selection criteria); H.R. Rep. No. 858, 95th Cong., 2d Sess. 6–7 (1978) U.S.Code Cong. & Admin.News 1978, p. 3569.

**40.** Mathias, *Advice and Consent: The Role of the United States Senate in the Judicial Selection Process,* 54 Chic.L.R. 200, 207 (1987).

**41.** *Id.* at 203.

**42.** ABA, *Standing Committee,* at 1.

**43.** *Id.* at 9.

**44.** *Id.*

the ABA Committee, though, at the same time, some Senators have questioned the Committee's methods and ideological neutrality,[45] and have suggested that undue weight is given to the Committee's rating.[46]

In short, the conclusion that the legislative branch cannot intervene in the Executive's selection process for judicial nominees springs directly from the text of the Constitution. Of additional importance in this case is that public scrutiny of the role of the ABA Committee, serving purposes similar if not identical to that of FACA, is already assured through the Senate's powers of advice and consent. This alone would warrant the conclusion that FACA cannot constitutionally be applied to DOJ's utilization of the ABA Committee. But, because the Supreme Court has suggested that a more flexible, pragmatic approach be applied in analyzing separation of powers issues, that balancing analysis is now addressed. Here, again, however, plaintiffs' arguments prove unavailing.

### 2. Nixon Balancing Analysis

In *Nixon v. Administrator, General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), the Supreme Court held that

> in determining whether the Act disrupts the proper balance between the coordinate branches, the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions. *United States v. Nixon*, 418 U.S., at 711–12 [94 S.Ct. at 3109–10]. Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress.

*Id.* at 443, 97 S.Ct. at 2790; *see also Morrison v. Olson*, — U.S. —, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988); *Common Cause v. Nuclear Regulatory Comm'n*, 674 F.2d 921, 935 (D.C.Cir.1982) (applying *Nixon* balancing analysis to application of Sunshine Act and rejecting defendant's strict separation of powers argument).

Applying this functional test here, the Court finds there is indeed obvious and significant potential for "disruption" of the President's constitutional prerogative during the nomination process; this impact has not been demonstrably justified by any overriding congressional need to apply FACA.[47]

Defendant suggests that "the FACA open meeting and records provisions, which are at the very heart of the Act, would severely intrude upon the President's interest in obtaining confidential, candid and timely advice concerning the qualifications of potential nominees for the federal courts." [48] The Court agrees, at minimum, that the application of FACA to the ABA Committee would potentially inhibit the President's freedom to investigate, to be informed, to evaluate, and to consult during the nomination process.

The Court does not doubt that application of FACA to the ABA Committee will discourage DOJ from consulting the ABA Committee or, alternatively, will discourage that Committee from continuing to perform the service of investigating and evaluating potential federal judicial nominees. As discussed above, for thirty-six years, through significant and numerous changes of Executive stewardship, DOJ has steadfastly relied on the ABA Committee to undertake a thorough investigation and evaluation of the professional qualifications of potential

---

**45.** *See, e.g., Bork Hearings*, at 907–08.

**46.** *See Bork Hearings*, at 943 (remarks of Sen. Humphrey: "The ABA is taken very seriously, perhaps too seriously by the public, and the Senate, in its evaluation...."); *Kennedy Hearings*, at 46 (remarks of Sen. Simpson: "somehow the American Bar has become a bigger player that they should be here.... We do not have a hearing until we know where you are. We do not proceed until we have had the word from the ABA, and I do not think that it's

right.... Maybe that is our fault. Maybe we have done that. I think it probably is.").

**47.** WLF itself concedes that Congress has "a constitutional and legislative interest in legislating in this area *so long as that legislation does not significantly encroach on the Executive.*" WLF Opp. at 31 (emphasis added).

**48.** Def.Opp. at 28.

nominees for federal judgeships. The hallmark of the ABA Committee's relationship with DOJ and its evaluation process is confidentiality.[49] The ABA Committee has found in its experience that "only by assessing and maintaining such confidentiality can sources be persuaded to provide full and candid information."[50] The ABA Committee also places a high value on confidentiality out of respect for the Presidential prerogative in the nomination process. As the Committee itself has observed: "Public disclosure of the Committee's evaluation prior to its report to the Senate Judiciary Committee after the nomination has been made is more serious. The nomination process is a Presidential function and the President should be able to obtain a confidential assessment of prospective nominees as an aid in making the nomination."[51]

The importance of confidentiality of communications and deliberations in the exercise of executive functions is well-recognized by the courts. The Supreme Court noted in *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1973), that there is a

> valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearance and for their own interests to the detriment of the decisionmaking process.

*Id.* at 705, 94 S.Ct. 3106. Even though the *Nixon* Court found that a subpoena issued against President Nixon was enforceable on the basis that the general presumptive privilege for Presidential communications was outweighed by the public interest in fair administration of criminal justice, the Court expressly recognized the "necessity

for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." *Id.* at 708, 94 S.Ct. at 3107; *see also Ryan v. Department of Justice*, 617 F.2d 781, 789–91 (D.C.Cir.1980) (acknowledging agency need as expressed in FOIA Exemption 5 to conduct deliberative processes out of public view in the interest of "frank discussion" and exempting questionnaires returned to DOJ by Senators that contained "probing analysis" of background of candidates for federal judgeships). In a similar case involving disclosure of background information on a federal judge, *Information Acquisition Corp. v. Department of Justice*, 3 GDS ¶ 83,149, (D.D.C.1981), the court denied disclosure under FOIA of documents collected by the FBI on a nominee for a federal judgeship because release would have violated substantial privacy interests and because there was a "strong public interest in candid and thorough investigations of presidential appointments." *Id.* at 83,782–83. The court further explained that certain documents consisting of communications to the President and the then-nominee from various individuals within and without the government were exempt from FOIA because "[t]hese documents are essential to the deliberative process of appointing judges to the federal bench and disclosure might chill the frank and candid evaluations from government individuals and private citizens that are necessary for the effective functioning of the appointment process." *Id.* at 83,785.

Plaintiffs contend that it is premature at this time to conclude that FACA's "openness" provisions would prevent DOJ from accomplishing its task of evaluating and recommending to the President prospective judicial candidates. This argument rings hollow. Plaintiffs cannot have it both ways. Plaintiff WLF specifically requests

**49.** ABA, *Standing Committee,* at 5 (interview with judges, lawyers, and law professors are confidential); *id.* at 6 (in forwarding report to Attorney General, ABA Committee protects confidentiality of those interviewed); *id.* at 7 (rating is confidentially reported to the Attorney General); *id.* at 7 (ABA Committee does not making rating public prior to Senate confirmation process unless authorized to do so by the

Attorney General); *id.* at 9 ("A persistent concern of the Committee in connection with its investigation of prospective nominees is confidentiality.").

**50.** *Id.* at 10.

**51.** *Id.* at 9–10.

as relief that this Court declare that "all" of FACA's requirements apply to the ABA Committee.[52] Public Citizen's complaint requests broadly that DOJ be ordered "to comply with FACA's requirements."[53] Although it may be strategically wise to suggest that this Court need not concern itself with the implications of actually applying FACA to the ABA Committee, it is disingenuous to argue that this Court is somehow "not confronted with a concrete case involving the specific application of any of FACA's provisions."[54] It must be presumed that plaintiffs mean what they say in requesting that FACA's few basic requirements be applied to the ABA Committee. Plaintiffs have not pointed to any support for their argument that only a theoretical facial application of FACA need be addressed here.[55] In particular, plaintiffs' argument that the ABA Committee may ultimately be found exempt from some of FACA's requirements under the deliberative process exemption is entirely unpersuasive.[56]

Plaintiffs also attempt to minimize these intrusiveness concerns by pointing out that the President has voluntarily subjected "established" advisory committees, such as the Tower Commission, to FACA even though the subject matter of the committee involved sensitive foreign policy or national security issues.[57] These examples do not dissuade the Court that application of FACA to the ABA Committee could be significantly disruptive. As defendant points out, the committees mentioned by plaintiffs were voluntarily subjected to FACA by the President. Each advisory committee must be evaluated individually according to its role, purpose, function, and

relationship to the agency or Presidential mandate at issue; and, as explained above, the clearly prescribed role of Congress set forth in Article II is an important basis for decision in this case.

The unique need for confidentiality in the initial stages of evaluating the professional qualifications of potential nominees for federal judgeships distinguishes this case from others where the public interest would be served by full disclosure throughout the agency's decisionmaking process. Unlike ordinary policy research and analysis, investigation of an individual's "competence, integrity, and temperament"[58] is inevitably a sensitive undertaking and it would normally evoke forthright, critical comments that would not otherwise be provided to decisionmakers were the comments to be made public. Furthermore, here, the public and Congress have a full opportunity to evaluate the actual nominee and to probe more deeply through the Senate confirmation hearings once the initial screening has been finished by the Executive.

Given this potential for significant disruption, the analysis turns to the second part of the *Nixon* analysis—whether there is an "overriding" congressional interest in application of FACA to the ABA Committee. As discussed above, the only role for Congress in the nomination process envisioned by the Constitution is the Senate's advice and consent function. Art. II, § 2, cl. 2. The purpose furthered by FACA—public accountability—is satisfied through the confirmation proceedings, where the Senate Judiciary Committee has the opportunity to question a representative from

52. WLF's Complaint, at 9.

53. Public Citizen's Complaint, at 4.

54. Public Citizen's Opposition to Defendant's Motion to Dismiss or in the Alternative for Summary Judgment and in Support of Its Motion for Summary Judgment ("Public Citizen Opp."), at 2.

55. *See Food & Chemical News*, 378 F.Supp. at 1051 ("Clearly where, as here, a federal agency utilizes an advisory committee for the purpose of obtaining advice, the agency must charter

and establish the committee in compliance with *all* the terms of the Act.") (emphasis added).

56. As the Court noted in *Nader v. Dunlop*, 370 F.Supp. 177 (D.D.C.1973), only "on the rarest occasions can the deliberative process exemption be properly invoked under FACA." *Id.* at 179. As defendant suggests, FACA was "designed to abrogate the deliberative privileges." Def.Opp. at 26 n. 21.

57. Public Citizen Opp. at 29.

58. ABA, *Standing Committee*, at 5.

the ABA Committee and to request additional information.[59] Other groups and individuals also have an opportunity to present their own views on the nominee and to differ with the ABA Committee regarding the nominee's qualifications. The Senate (like DOJ) is free, of course, to reject the advice from the ABA Committee and from others. Indeed, that members of the Senate Judiciary Committee have questioned the role of the ABA Committee for the same reasons proffered by plaintiffs demonstrates that Congress can seek greater accountability directly, without interfering in the initial selection process through FACA.[60]

While the deliberations of the ABA Committee have not gone uncriticized, few would doubt that the ABA Committee has contributed significantly to the integrity of the nomination process for federal judges and that the members of the ABA Committee have performed a difficult task and valuable public service, without compensation, and quite often without thanks.[61] Not surprisingly, the ABA Committee itself, while not a party to this action, has clearly gone on record as vigorously objecting to the argument that it is subject to FACA.[62]

Plaintiffs have thus not articulated any compelling, let alone overriding, congressional justification for applying FACA to

the ABA Committee and under *Nixon* application of the statute would, therefore, be unconstitutional.

### III. Conclusion

In sum, the Court concludes that DOJ utilizes the ABA Standing Committee on Federal Judiciary as an advisory committee as defined by Section 3(2) of FACA, but that the Act cannot be constitutionally applied to the Committee because of the express provision of Article II, § 2, cl. 2, of the Constitution that the President alone shall nominate candidates for federal judgeships. The role of Congress is limited to the Senate's advice and consent function. Furthermore, as discussed above, the purposes of FACA are served through the public confirmation process and any need for applying FACA to the ABA Committee is outweighed by the President's interests in preserving confidentiality and freedom of consultation in selecting judicial nominees.

Accordingly, it is hereby

ORDERED that plaintiffs' motions for summary judgment be and they hereby are denied; it is

FURTHER ORDERED that defendant's motion to dismiss or, alternatively, for summary judgment be and it hereby is granted.

---

**59.** It is noteworthy that while the ABA Committee keeps its sources and deliberations confidential, it does make public a detailed explanation of its purpose, structure, membership, and procedures in the form of the *Standing Committee* booklet.

**60.** *See, e.g.,* Mathias, *Advice and Consent,* at 206 ("The ABA Committee should be encouraged to provide more detail on the evaluation of nominees referred to it, particularly in cases in which it is less than unanimous in its conclusion that a nominee is qualified."); *Bork Hearings,* at 938 (remarks of Sen. Grassley: "[W]e have put great weight on the ABA's opinion.... So why should we not freely discuss who is for and who is against? That makes people responsible for their actions, if they serve a kind of quasi-public function, which I think the ABA does in this particular instance."); *Kennedy Hearings,* at 27 (remarks of Sen. Hatch urging ABA Committee to "remov[e] cloak of anonymity from your proceedings"); *id.* at 31–32 (remarks of Sen. Hatch: "If we see another repeat of what happened to Judge Bork, this

Senator is going to do everything in his power to make sure that there will be explanations given in full, fair, and open hearings."); *id.* at 86 (remarks of Sen. Biden: indicating interest in discussing Judiciary Committee's relationship with ABA Committee); *but see id.* at 71 (remarks of Sen. Biden: "preposterous" to suggest that ABA Committee should open up entire process to public view because "[s]ome of what you hear is hearsay. Some of what you hear is gossip. Some of what you hear is substantive.").

**61.** *Bork Hearings,* at 978 (remarks of Sen. Biden).

**62.** *See* Answer, Civil Action No. 85–3918, ¶¶ 43, 53; *Kennedy Hearings,* at 30 (remarks of Judge Tyler: "to say that we have to have the sunshine laws apply to us, or that we have to individually account, would really turn the whole process, and the work of [the Senate Judiciary Committee] on its head."); *id.* at 67–68 (remarks of Judge Tyler).

This action is dismissed. A separate judgment accompanies this Memorandum Opinion.

IT IS SO ORDERED.

## JUDGMENT

In accordance with the Memorandum Opinion issued this same date, judgment is hereby entered against plaintiff Washington Legal Foundation and plaintiff-intervenor Public Citizen and in favor of defendant United States Department of Justice.

IT IS SO ORDERED.